[Crim. No. 26579. Second Dist., Div. Five. Dec. 29, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
WALTER EDGAR MARX, Defendant and Appellant.

COUNSEL

Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Frederick R. Millar, Jr., and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KAUS, P. J.—Defendant Walter Marx was indicted by a grand jury for murder, and, after a court trial, was found guilty of voluntary manslaughter.[1] He was sentenced to prison.

FACTS

The victim was Lovey Benovsky, a woman possibly 75 years of age.[2] Defendant boarded at Benovsky's home on weekends. Benovsky was last seen at about 8:30 p.m. on Saturday, February 2, 1974, by a neighbor with whom she had been watching television. The next day, Sunday, at about 3 p.m., another neighbor, learning that Benovsky had not been seen that day, went to her home and looked in the front window into her bedroom. Benovsky was lying on her bed; there was blood on the pillow. The neighbor called the police.

Firemen arrived first. The neighbor's wife knew where a house key was hidden and gave it to the firemen. The fire department captain testified that the body was in kneeling position when he arrived. The police arrived shortly thereafter. The victim was found nude, lying face down on a bed. The mattress was bloody, but there was no other blood in the room. A bath towel found in the bathroom had blood on it.

Human blood was found on a pair of Levis belonging to defendant. The blood could not be typed, and may have been as old as one year.

---

[1]Defendant pleaded not guilty, and not guilty by reason of insanity. Both counsel stipulated that the court could hear both phases of the trial concurrently. The court found that defendant was sane at the time the offense was committed.

[2]We have found no transcript reference to the victim's age. We estimate it from exhibits with which the record was augmented.

The bloody towel in the bathroom was found to have human blood, either types A and B superimposed, or AB. The victim had type "B" blood and defendant had type "A" blood.

The coroner performed an autopsy on February 4. He attributed the cause of death to manual strangulation. The victim had also been knifed in the vagina. The coroner further observed "an elliptical laceration of the nose," which he believed were teeth marks. The knife wound was inflicted after the strangulation. In the coroner's opinion, the victim had been dead from 15 to 25 hours when she was discovered—at about 6:30 p.m., Sunday, according to his records. Thus, the victim was killed probably some time after 8:30 Saturday evening when she was last seen, and before about 3:30 Sunday morning.[3]

A police officer interviewed defendant after advising him of his rights. Defendant said he had known the victim for about six months, and that he rented a weekend room from her at a rate of $15 per week. During the week he lived with Louise Wileman, who had been recently divorced and had weekend custody of the children. Defendant preferred to take a weekend room to staying with Wileman when the children were there. On Friday evening, February 1, he arrived at Benovsky's house at about 9 or 10 p.m. They watched television together and he drank some brandy. He stayed the night and then went to Louise Wileman's house at about noon or 1 p.m. They had supper at home because they were short of funds, and then at about 9 or 10 p.m., Wileman drove him back to Benovsky's house. He stayed there a short time. Everything appeared normal. He walked to a bar called the "488 Keys" where he had more drinks and then went to a second bar where he had a few more drinks. He then walked back past Benovsky's house and checked into the El Rancho Motel.

According to the motel owner, defendant arrived at the El Rancho some time between midnight and 2 or 3 a.m. She testified that defendant did not appear to be either drunk or high on drugs. He had stayed at the El Rancho before. The room cost $14.

Defendant told the police officer that he checked out the next day at about noon and called Louise Wileman, who picked him up. Defendant said that he had rented a motel room because he had made plans with a co-worker to go fishing late Saturday night or early Sunday and that these plans had fallen through.

---

[3]A police officer testified that he had arrived at about 4 p.m. in the afternoon. The time referred to by the coroner may have been the time that the police report was prepared.

A co-worker of defendant testified, however, that while he and defendant did have plans to go fishing, something came up and he told defendant on Friday, February 1, that he would not be able to make it. In any case, had the trip taken place, he would have picked up defendant at Wileman's house at 1 a.m.

A psychiatrist, called by defendant, testified that defendant under sodium pentothal did not recall committing the offense. During a later interview at the county jail, he did recall trying to help the victim by giving mouth-to-mouth resuscitation, of possibly seeing someone else leaving the house, of realizing that the victim was dead and feeling frightened and leaving.

After the interview with the police officer, defendant was asked if he would provide samples of his fingerprints and body hair. He refused. A search warrant was obtained to secure defendant's fingerprints, body fluids, and a cast of his teeth. He refused to comply with the order. On February 12, the prosecutor told defendant that there was a court order, that he had no right to an attorney, that he had no right to refuse to comply with the order, and that such refusal could be used against him as evidence in court. Defendant still refused to comply.

On February 13, defendant was brought before the judge who had signed the search warrant. Defendant did not request an attorney, but indicated that "he or some member of the family were in the process of arranging for him to be represented by counsel." The judge ordered defendant to comply. Defendant refused and was brought back to the court that day. He was again ordered to obey the court order and told that if he did not, he could be found in contempt of court and jailed until he did comply, and that his refusal "could be used against him in a trial." Defendant refused to comply and was jailed. On March 20, he was again brought before the court, which was advised that he was now willing to comply with the court order.

On March 20, a dentist made impressions of defendant's upper and lower teeth—later introduced into evidence. After the impressions were made, and defendant had submitted to the other tests, he was released and exonerated from contempt. The prosecutor told the detectives that the most promising area of further investigation was to exhume the victim's body and to obtain a cast of the bite mark on her nose.

The autopsy of the victim had been performed on February 4, and the body buried in Dallas, Texas, on February 7. On March 25, it was exhumed and impressions of the wound on the victim's nose were made.

The central issue in this case is the admissibility of expert testimony —supported by many exhibits—that the bite on the victim's nose was made by defendant's teeth.

Three dentists testified on behalf of prosecution. One dentist testified on behalf of defendant. The three prosecution experts were: Reidar Sognnaes, a dentist and professor at UCLA medicine school;[4] Gerald Vale, a dentist and lawyer and chief of forensic dentistry with the Los Angeles Coroner's office; and Gerald Felando, a dentist in private practice. The project of identifying the teeth which made the bite on the victim was conducted in part as a joint effort. Each of the three experts used somewhat different analytic techniques.

Defendant did not testify.

## DISCUSSION

### A. *The Expert Evidence*

■ The relevance of the expert testimony turned on two postulates: first, that, as a general rule, it is possible to identify a person from his dentition; second, that in this particular case there was enough evidence of a "match" between defendant's dentition and the victim's wounds to enable experts to make such an identification, and, thereby, to eliminate others as suspects.[5]

---

[4] Doctor Sognnaes clearly had the most seniority among the prosecution's three expert witnesses. He finished his dental school education in his native Norway in 1936. He interned in Boston, Massachusetts in 1938 to 1939. He then received a doctor's degree in pathological anatomy from the University of Rochester. After World War II he joined the faculty at Harvard where he moved "through the ranks" to become associate dean. In 1960 he came to UCLA to become the "founding dean" of its new School of Dentistry. He has specialized in "various problems that relate to identification of dental structures," his interest having been aroused by the dental relics of George Washington. At the time when he testified in this case he was working on a definitive work on the dentition of the father of his adopted country which he hoped to complete on the nation's Bicentennial.

[5] The three prosecution witnesses summarized their findings as follows:
Doctor Sognnaes:
". . . I am compelled to draw the conclusion that the bite marks observed on the victim are in complete harmony with the anatomical configuration of the teeth of the suspect. . . . And, consequently, I must conclude that the possessor of the teeth from whom these

The real dispute on admissibility centers on the second of these premises. Defendant concedes that the science—or art—of identifying persons through their teeth is, as such, well-established. Each of the three prosecution experts and even defendant's own expert had performed such identifications.[6] While the field is relatively new and experts do not agree on the exact number of similarities necessary to make a positive identification, the prosecution experts stressed the obvious point that it is not the number of similarities, but their quality which is most helpful.[7] Further, this being a case involving identification by bite marks, rather than by comparing a dentition with two-dimensional X-rays and charts, the experts were able to use a virtually unprecedented three-dimensional approach. Thus, apart from a wholly unmeritorious claim that the experts used an approach condemned by *People* v. *Collins,* 68 Cal.2d 319 [66 Cal.Rptr. 497, 438 P.2d 33, 36 A.L.R.3d 1176], the basic ability of experts to identify persons from their teeth is not in issue.

What defendant does attack is the admissibility of the prosecution evidence insofar as it rests on the experts' asserted ability to prove identity from similarities between bite marks and the dentition of a person suspected of having made those marks.

Concededly, there is no established science of identifying persons from bite marks as distinguished from, say, dental records and X-rays. Indeed, the testimony of the three prosecution experts reflects their enthusiastic response to a rare opportunity to develop or extend forensic dentistry into the area of bite mark identification.

---

casts were made must have made these marks in the skin of the victim."
Doctor Vale:
"My basic opinion and conclusions are that the bite marks that I studied [were], in fact, made by the teeth that were reproduced in the models labeled 'Suspect W. Marx.' That is my basic conclusion: That the bite mark matches the teeth reproduced in the model."
Doctor Felando:
" . . . Without a doubt . . . the suspect's teeth did make the bite mark."

[6]Doctor Sognnaes, for example, had been involved in the identifications of Adolf Hitler, Martin Bormann and Eva Braun, based on their teeth. Doctor Vale had participated in the identification of the victims in the Los Angeles SLA shootout. Doctor Felando participated in identifying victims from a Pan-American Airline crash, and the defense expert, Dr. Nedelman, had identified casualties as a naval officer.

[7]Doctor Sognnaes testified that an identification can be made from 12 "general characteristics" in which case no "extraordinary" characteristics are needed. On the other hand, the more extraordinary the characteristics are, the fewer are needed for a positive identification. In this case the three prosecution experts agreed on a total of 17 "identification characteristics" some of which were "extraordinary." Much detailed testimony in support was given.

The state of the art was summed up by Dr. Sognnaes: "There have been cases where bite marks have been identified in various inure substances or, in theory, for example, a piece of chocolate found on a desk where the crime was committed or banana or marzipan or apples or even wood. . . . [¶] In the case of bite marks in skin, most of the ones that have been in the literature have been on the softer portions of the body, notably in sex crimes related to the female breasts. And here, of course, there is a very soft underbase and consequently the bite marks are not very deep. . . . [¶] In this particular case, . . . we do have a third dimension to these marks, that they are very deep indeed, which makes the comparison with the dentition that can make the bite marks much more sufficient. . . . [¶] From all I have read in literature and discuss[ed] now with colleagues . . . this particular case will be recorded as one of the most definitive and distinct and deepest bite marks on record in human skin."[8]

None of the prosecution experts specifically identified the other tooth-bite cases. There was no evidence of systematic, orderly experimentation in the area.[9] Moreover, in this particular case, there was the

---

[8]Referring to photographs taken during the victim's autopsy, Dr. Vale testified:

"Now, in looking at this evidence, I was immediately struck by several features. The most striking thing when one first looks at this photograph is the fact that what we are seeing here appears to be a human bite mark and more than that it appears to be an exceptionally well defined human bite mark.

"Now, I would like to emphasize that this is not the first bite mark I have ever looked at. There are a number of bite marks published in literature and I have previously had bite marks presented directly to me for examination.

"I would like to also comment in the earlier cases I have refused to testify in court. I have refused to give any definitive opinion on the previous bite marks that have been presented to me because they were not, in my opinion, sufficiently detailed nor sufficiently useful to serve as evidence. But this was certainly the clearest bite mark that I had ever seen, either personally or published in the literature. There seemed to be no question about it being a human bite mark because of the general contour that it followed, which would be consistent of the contour made by the human arch when impressed upon the subject such as a nose.

"The second thing that made it quite distinctive in terms of the bite mark, that is, we could see certain characteristics of individual teeth as we looked at the bite mark.

"And then the third feature that was most apparent to me was that orientation was quite simple. In other words, here is a bite mark that a dentist could look at and could quite quickly orient himself as to what he was seeing, as to which teeth were which."

[9]This does not necessarily mean that none could have been produced. The record is quite ambiguous with respect to the precise nature of the defense objection to the admissibility of the prosecution's expert testimony. From the trial record which we have it appears that counsel stated his objection in an unreported discussion with the court before any evidence was taken. The court ruled, perfectly properly, that it would first have to hear the evidence before being able to rule on its admissibility. When, after all the evidence had been received subject to the defense objection, the parties started to argue, the prosecutor claimed, without specific contradiction by defense counsel or the

further difficulty that although the victim died on February 3, casts of her nose were not taken until March 25, after an autopsy had been performed and she had been embalmed, buried, and exhumed.[10]

The general rules for the admission of scientific evidence were summarized in *Hodo* v. *Superior Court,* 30 Cal.App.3d 778, 784-785 [106 Cal.Rptr. 547]. (See also *Huntingdon* v. *Crowley,* 64 Cal.2d 647, 653-654 [51 Cal.Rptr. 254, 414 P.2d 382]; *People* v. *King,* 266 Cal.App.2d 437, 443-445 [72 Cal.Rptr. 478].) ■ In brief, evidence of scientific tests is admissible when the technique has received general acceptance by recognized experts in the field.

The determination of "general acceptance" is primarily a question of fact for the trial court subject to an appellate court's determination that the trial court has not abused its discretion.[11] (*People* v. *King, supra,* 266 Cal.App.2d at p. 443.) Leaving aside the question whether tooth bites made into human flesh are sufficiently common in forensic dentistry to

court, that defendant had not objected on the ground that identification of persons from bite marks was not sufficiently established to have gained general acceptance in the field of forensic dentistry. However, when the court asked defense counsel to restate the ground for his objections specifically, he relied on section 801, subdivision (b) of the Evidence Code—a ground of objection that is co-extensive with the entire field of expert testimony. We resolve this conflict in the record by giving defendant the benefit of the doubt.

[10]Defendant properly points out that the relevant "match" is the one between his teeth and the wounds in the victim's nose immediately after they were inflicted, rather than any similarity between his teeth and the impressions that were made in Dallas. Undoubtedly, the relevance of the prosecution evidence depended on a proper foundation that the Dallas impressions were correct reproductions of the Los Angeles wounds. While the prosecution's proof on that point did not exclude all possibility of error, it was certainly substantial. There was no evidence of any tampering with the wounds between the time of the discovery of the body and its embalmment a few days later. The embalming process fixed the tissues in a "quite solid position." The Dallas criminologist who made the impressions—the chief of the Physical Evidence Section at the Dallas County Institute of Forensic Sciences—testified in great detail concerning his procedures in obtaining them from the exhumed body of the victim. He first cleansed the area and then made two impressions which picked up any residue of makeup. These were discarded. Only then did he make the impressions which were offered in evidence. He used a material he had been using for several years "primarily for reproducing tool marks at the scene of burglaries." Dr. Sognnaes testified that the resulting casts "reflected [with] great accuracy the details of the surface . . . being replicated." He also spoke of the "perfection with which these post-mortem replicas were made."

[11]Thus, the trial court "abused its discretion" in *People* v. *Law,* 40 Cal.App.3d 69, 84-85 [114 Cal.Rptr. 708], in permitting voice print identification evidence where it was not disputed that the caller had used a disguised voice. Earlier, in *Hodo* v. *Superior Court, supra,* 30 Cal.App.3d 778, 790-791, the same court had concluded that voice print identification, having received general acceptance by recognized experts in the field, was now admissible.

expect that orderly experimentation will ever be possible,[12] we do not believe that under all the circumstances of this case the standard of "general acceptance by recognized experts in the field," is determinative of the admissibility—as distinguished from weight—of the evidence in this case.

The rule that a scientific principle "must be sufficiently established to have gained general acceptance in the particular field in which it belongs" was launched in *Frye* v. *United States* (App.D.C. 1923) 293 F. 1013, 1014. (See McCormick on Evidence, § 203, p. 489.) The rule, though accepted in California (see *Huntingdon* v. *Crowley, supra,* 64 Cal.2d at pp. 653-654), has been criticized. McCormick suggests that *Frye* was an unjustified or at least inadequately explained departure from the general rule that on matters subject to expert testimony the opinions of witnesses "skilled in that particular science, art or trade to which the question relates are admissible. . . ." (McCormick, *supra,* § 203, p. 489.) Moreover, he claims, the application of the *Frye* test has been "highly selective, although not enlightening as to its details." (*Id.* at p. 490.) He asserts that in several recent cases the test has been tacitly ignored.[13]

We would not agree with this criticism even if California precedents left us free to do so. The *Frye* test finds its rational basis in the degree to which the trier of fact must accept, on faith, scientific hypotheses not capable of proof or disproof in court and not even generally accepted outside the courtroom. *Frye,* for example, involved the lie detector test in which the trier of fact is required to rely on the testimony of the polygrapher, verified at most by marks on a graph, to which the expert's hypothesis gives some relevant meaning. Similar total reliance on the expert's assumptions is required for the voice spectrogram (see *Hodo* v. *Superior Court, supra,* 30 Cal.App.3d 778, 781), blood tests, breathalyzer tests and radar. (See generally, McCormick, *supra,* p. 484 et seq.)[14] The

---

[12]As part of the experimentation in this case, one of the investigating officers was persuaded to permit Dr. Vale to "bite" him in his arm and nose with the casts of defendant's dentition.

[13]E.g., *Coppolino* v. *State* (Fla.App. 1968) 223 So.2d 68, 75 (concurring opn.): "The tests by which the medical examiner sought to determine whether death was caused by succinylcholine chloride were novel and devised specifically for this case. This does not render the evidence inadmissible. *Society need not tolerate homicide until there develops a body of medical literature about some particular lethal agent.* The expert witnesses were examined and cross-examined at great length and the jury could either believe or doubt the prosecution's testimony as it chose." (Italics added.)

[14]Indeed, it is evident that in most cases the expert himself must accept certain dogmas of his profession on faith. We doubt that the average criminologist could supply the data on which the reliability of fingerprint evidence is based. (See Karjala, *The Evidentiary Uses of Neutron Activation Analysis* (1971) 59 Cal.L.Rev. 997, 1021-1022, fns. 136, 138.)

same concern that the trier of fact will be overwhelmed by "ill conceived techniques with which the trier of fact is not technically equipped to cope," sacrificing its independence in favor of deference to the expert, is reflected in *People* v. *Collins, supra,* 68 Cal.2d 319, 332, in which the prosecution relied on—erroneous—statistical evidence.

What is significantly different about the evidence in this case is this: the trier of fact, here the court, was shown models, photographs, X-rays and dozens of slides of the victim's wounds and defendant's teeth. It could see what we have seen in reviewing the exhibits to determine the admissibility of the evidence. First, for example, the extent to which the appearance of the wounds changed between the time that the autopsy was performed and the time that the body was exhumed in Dallas. Second, the extent to which the purported bite marks appear to conform generally to obvious irregularities in defendant's teeth. Thus the basic data on which the experts based their conclusions were verifiable by the court. Further, in making their painstaking comparisons and reaching their conclusions, the experts did not rely on untested methods, unproven hypotheses, intuition or revelation.[15] Rather, they applied scientifically and professionally established techniques—X-rays, models, microscopy, photography—to the solution of a particular problem which, though novel, was well within the capability of those techniques.[16] In short, in admitting the evidence, the court did not have to sacrifice its independence and common sense in evaluating it.

This does not mean, of course, that the trier of fact had to give credence to all of the experts' final conclusions. The issue is admissibility. Indeed, the record indicates that the trial court did not fully accept the prosecution evidence. In denying defendant's motion for a new trial, the court stated that the evidence was "admissible for whatever weight is to be given to it . . . [I]t was given some weight by me. However, all of the other evidence, circumstances and other evidence, that was presented in the case was considered by me also in arriving at the determination of finding the defendant guilty as I did find."

[15]Compare the testimony of the only expert produced in *People* v. *King, supra,* 266 Cal.App.2d 437, 451: " 'I am a forerunner in this field and I have been the person who has devised the system by which this is done, . . .' "

[16]Indeed, the novelty of certain investigative techniques was stressed by the three prosecution experts. Thus, for example, Dr. Sognnaes emphasized that by the use of enlargements and a scanning electromicroscope he was able to achieve "an enormous improvement in the human eye" and "an unusual three-dimensional effect." Doctor Felando testified that he employed a new X-ray technique in connection with his investigation.

██ ██ The court pointed out that if it "was making its findings based just on the bite mark as it compared to . . . the defendant's dentition, I am not sure that there perhaps would not be a reasonable doubt. However, taking that bit of evidence and giving it the weight to which I felt it was entitled and perhaps not in as refined a manner as the experts for the People would have liked the trier of fact to find, but in a more gross manner, I still feel that it was helpful plus all of the other evidence that was in the record here pointing to the defendant."[17]

The trial court properly admitted the expert evidence.

██ Defendant also contends that to the extent that the experts' opinions were based on mathematical probabilities and numbers, those opinions were inadmissible under the rule in *People* v. *Collins, supra,* 68 Cal.2d 319. The point has no substance. First, the prosecutor, in what was possibly an excess of caution, withdrew an exhibit involving statistical data. Second, defense counsel deliberately tried to infect the trial with error by asking Dr. Vale, on cross-examination, whether he used some mathematical formula. The witness replied that he discussed the subject of "mathematical probabilities" quite generally with a mathematician on the USC faculty. At no time, however, did he reach a conclusion that there was a "specific number of probabilities." All he did "was to become convinced that the number of possibilities was indeed very large."

It was entirely proper for the expert to confirm his view that defendant's dentition was unusual enough to point to him as the person who had left his marks on the victim's nose by acquainting himself, quite generally, with the degree of possibility that another human being would exhibit the same combination of unusual features peculiar to defendant's

---

[17]Taken at face value, the expert evidence alone would have been sufficient to convict defendant: its total impact clearly was that defendant, and no one else, left the bite marks on the victim's nose. The court evidently did not fully accept that conclusion, but felt that the expert testimony indicated such a probability of the marks being defendant's, that, together with the balance of the prosecution evidence, it eliminated any reasonable doubt. There is a suggestion in defendant's brief that absent total reliance on the expert testimony, the evidence was insufficient to convict. We disagree. Apart from the experts, the following evidence supports the conviction: (1) Defendant had the opportunity to commit the crime. (2) He gave a false account of his reasons for staying at the El Rancho Motel. (3) He chose to spend 40 days in jail rather than give an impression of his teeth. (4) He admitted to the psychiatrist that he had been in the victim's house after she was dead. The psychiatrist's testimony was admitted for all purposes (cf. *In re Spencer,* 63 Cal.2d 400, 412 [46 Cal.Rptr. 753, 406 P.2d 33]) and, incidentally, is the apparent reason for defendant's conviction of manslaughter rather than murder.

dentition. None of the witnesses engaged in a "trial by mathematics" (*People* v. *Collins, supra,* 68 Cal.2d at p. 332) on or off the witness stand. There was no error.

B. *Defendant's Refusal to Comply With Search Warrant*

■ Defendant's only other contention is that it was error for the trial court to infer consciousness of guilt from his prolonged refusal to allow casts of his teeth to be taken. He asserts that he was entitled to an attorney "for the purpose of understanding the nature of the requests being made of him, and his rights and duties in connection with them."

The law is clear: since defendant had no right to refuse to submit to the tests ordered in the search warrant (see *People* v. *Sesslin,* 68 Cal.2d 418, 429 [67 Cal.Rptr. 409, 439 P.2d 321]), there was no deprivation of a right to counsel, who only could have advised him to comply. (See *Hawk* v. *Superior Court,* 42 Cal.App.3d 108, 117 [116 Cal.Rptr. 713].)

Even if no inference of a consciousness of guilt could be drawn from defendant's refusal if it had, in fact, been based on an erroneous but good faith belief that the law did not demand compliance until after counsel has been appointed or retained, nothing in this record supports an assumption that such was the case. All we know is that on February 13, the judge who had ordered compliance specifically informed defendant that his refusal "could be used against him" in a trial. At the same time he was advised that defendant was in the process of arranging for representation. Weeks later, shortly after counsel was retained, defendant decided to comply. This merely shows the good sense of the attorney. It sheds no light on the reason for defendant's earlier refusal.

The judgment is affirmed.

Stephens, J., and Ashby, J., concurred.