[No. A026128. First Dist., Div. Five. Mar. 26, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
LEWIS PATRICK KNIGHTS, Defendant and Appellant.

COUNSEL

Jonathan M. Purver, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Karl S. Mayer, Assistant Attorney General, Ann K. Jensen and Linda Ludlow, Deputy Attorney Generals, for Plaintiff and Respondent.

OPINION

**LOW, P. J.**—Defendant Lewis Patrick Knights appeals from judgment entered after a jury found him guilty of first degree murder (Pen. Code, § 187) and found true an allegation of use of a deadly weapon in the commission of the offense (Pen. Code, § 12022, subd. (b)). This case was submitted, pursuant to California Rules of Court, rule 17(b), on the record and on appellant's opening brief filed October 19, 1984. We regret that we did not have the brief of the Attorney General which might have aided our review.[1]

---

[1] As of March 5, 1985, the date for oral argument, the Attorney General had failed to file a respondent's brief after notification, on November 27, 1984, that a brief was due within 30 days. After receiving notice of the application of California Rules of Court, rule 17(b), the Attorney General sought a continuance to January 27, 1985, for filing its brief because of delays resulting from "clerical inadvertence." We denied the request for lack of good cause and ordered the matter to be argued on our March 1985 calendar. From November 28, 1984, to February 27, 1985, the Attorney General had no communication with the court concerning this case. On February 27, 1985, the Attorney General moved for a continuance which was denied. On March 5, 1985, the Attorney General appeared for oral argument and renewed its request for a continuance. The request was again denied; appellant waived oral argument and the Attorney General was unprepared to argue.

To ensure fairness and avoid prejudice, a court must be able to control its own calendars and to minimize delays in the disposition of appeals. Delays are often defined by "local legal culture," i.e., what the attorneys request, what the court accepts and what the legal community tolerates. There must be considerable cooperation if we are to bring enduring respect and confidence to the legal system. Greater consideration must be given to the public's interests and the litigants' interests because they bear the burdens of delay. The litigants' rights are most affected. Delays in criminal cases have a greater potential for prejudice: If an appealing defendant is in custody, his liberty interests are affected and the public unnecessarily may have to pay the added cost of incarceration; if a new trial is ordered, there is the danger of lost or stale evidence, missing witnesses and faded memories affecting all parties. Delays also increase the risk of changes in the law or new interpretations of existing law, with the result that even more time is required to resolve an appeal because new arguments and issues must be considered. All litigants are entitled to a speedy resolution of an appeal. We are sympathetic to the Attorney General's problems of overworked staff and heavy case loads, but more tolerance for delay in filing briefs is not the proper solution. Unfortunately, heavy case loads have become a fact of life in our legal system and each actor in the system must work to the best of his or her ability under these less than desirable conditions. A delay, even a temporary one, in one part of the system has repercussions throughout the rest of the system. If merited, this court has and would continue to support added staff for the Attorney General. But this case, as well as others presently before this court with similar delays in briefing by the Attorney General (*People* v. *Bynum* (AO25425) [appeal pending]; *People* v. *Simmons* (AO24692) [appeal pending]), illustrates a lack of diligence that does not tend to support an ardent advocacy for more staff.

On appeal, defendant contends the trial court erred (1) in denying his motions for a mistrial and a new trial because juror misconduct irreversibly prejudiced him, and (2) in admitting expert testimony regarding footprint identification. We affirm.

## I.

On the evening of February 5, 1976, Don Davis asked defendant to accompany him to an apartment on Bahia Way in San Rafael so Davis could buy a fish tank. The people selling the fish tank were not at home; Davis and defendant went to an apartment across the landing. Davis asked the occupant, Marianne Mathews, if she knew when the people selling the fish tank would return; she did not know. Davis asked for paper and pencil so he could leave a message. After leaving the message in the doorjamb of the first apartment, Davis left with defendant. When they got back to the car, defendant told Davis he wanted to go back to make a date with Mathews. Defendant returned after about 20 to 30 minutes carrying Mathews' purse; his hair was also "dripping wet." Defendant told Davis he had taken a shower, and, at Davis' request, threw the purse in a gutter. Later, at a bar in Greenbrae, defendant told Davis he had stabbed Mathews in the throat because "he was trying to take her panties down and she was screaming and yelling and bit his finger." Defendant said that he took a shower after killing Mathews.

Mathews' body was discovered the following afternoon when Elaine N. and Dianne R., two of Mathews' friends and classmates, became concerned about Mathews' absence and went to her apartment. Both noticed her apartment door was ajar; Dianne entered and saw a head of hair, discolored and surrounded by what appeared to be "very dry, black blood." She immediately left the apartment to summon the police. One of the police officers who came to Mathews' apartment, Sergeant Kosta, noted that Mathews' hair was bloody, her throat was slit and her body was partially disrobed. There was a knife protruding from her chest and a broken flowerpot next to her head. Kosta also found some bloody sockprints in the kitchen and a partial print in the bathroom. The coroner, Ervin Jindrich, later testified that, in addition to a deep scalp laceration and stab wounds in her neck and chest, there was evidence of strangulation, dried semen in Mathews' pubic hair, and spermatozoa in her vagina and rectum.

The initial investigation into Mathews' death led to no arrest, but the case was reopened in August 1982 by Detective Ted Lindquist of the San Rafael Police Department when he received new information. Defendant became a suspect in the Mathews' killing as a result of a monitored telephone conversation and subsequent police contacts with an inmate at San Quentin. On

October 29, 1982, Detective Lindquist and Sergeant Kosta questioned defendant at California Men's Colony in San Luis Obispo, where defendant was serving a sentence for the murders of Rebekah Mathison and her daughter Shaunicy. Following the visit by Lindquist and Kosta, defendant contacted his sister, Barbara N., and when she visited him a few days later, defendant admitted raping and killing Mathews. On November 23, 1982, defendant was charged with the murder of Mathews.

Four motions *in limine* were made prior to trial. In regard to the prosecution's motion to admit evidence of the two Sonoma County murders committed by defendant, the court ruled only the murder of Rebekah Mathison could be admitted and used for the limited purpose of showing identity and intent. The court denied the prosecution's motion with respect to the murder of Mathison's four-year-old daughter, Shaunicy, because of the possibility of prejudice and lack of relevance. Defendant's motion to exclude the testimony of the prosecution's expert witness on footprint identification, Louise Robbins, was granted in part.[2] The court ruled Dr. Robbins' method for measuring and comparing footprints was unreliable because it could not be verified by other scientists in the same general field. As a result, Dr. Robbins would not be able to express her opinion on the comparison of defendant's footprint exemplar and the photographs of the bloody sockprints found in Mathews' apartment. Dr. Robbins, however, could testify to any measurements she had taken which conformed to well-established standards in the scientific community.

## II.

During the second but first full day of jury deliberations, the court was informed by the jury foreman that a problem had arisen: One of the jurors had brought in evidence not raised at trial by saying, "Well, he killed the four-year-old child!" The foreman's note asked for the court's opinion before the jury would resume its deliberations. Through an exchange of notes between the foreman and court, the identity of the juror who had made the remark was learned; the juror, Marie M., returned to the courtroom where the court conducted a voir dire. She told the court that she had seen some friends at the bank a week earlier and told them she would be unable to attend a social engagement because of jury duty. As the juror was walking

---

[2]Dr. Louise Robbins is an associate professor of anthropology at the University of North Carolina. Her work is premised on the theory that each person's footprint is unique; in other words, a person can be identified by his or her footprints. Dr. Robbins has presented her theory and research in seminars for forensic anthropologists and in one paper, "The Individuality of Human Footprints," which was published in the Journal of Forensic Science; she is currently writing a book as well. She has been qualified to testify as an expert in Pennsylvania, New York, North Carolina, Florida, Kentucky, Ohio, Oklahoma, California and Manitoba, Canada.

away, she overheard one woman say to the other, "Oh, that's that murder case from Sonoma where that man killed a woman and a four-year-old child." Although the juror felt the overheard conversation would not affect her judgment, the court excused her and replaced her with an alternate juror.

A showing of juror misconduct raises a presumption of prejudice to the defendant. The presumption, however, may be rebutted by proof that no prejudice actually resulted. (*People* v. *Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050]; *People* v. *Pierce* (1979) 24 Cal.3d 199, 207 [155 Cal.Rptr. 657, 595 P.2d 91].) We review the entire record "to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct. [Citations.]" (*Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 417 [185 Cal.Rptr. 654, 650 P.2d 1171].)

The juror's statement that defendant had killed a four-year-old child constituted misconduct, for a juror cannot consider evidence obtained from sources other than in court. (*People* v. *Martinez* (1978) 82 Cal.App.3d 1, 21 [147 Cal.Rptr. 208].) Nevertheless, the presumption of prejudice is rebutted by the record. The record shows an extremely conscientious jury. A great deal of media publicity surrounded defendant's trial, and the jury was regularly admonished not to read any newspaper articles about the case. After an article had appeared in the *Independent Journal* discussing the Sonoma County murders, defense counsel requested a voir dire of the jury, although he expressed reservations about the willingness of individual jurors to acknowledge in front of others that they had disobeyed a court order not to read about or discuss the case. Despite defense reservations, however, two jurors volunteered information during voir dire that their spouses had attempted to discuss aspects of the case; both jurors refused to discuss or listen to anything said by the spouses. The misconduct occurred early in the deliberations and was brought immediately to the court's attention by the foreman because some jurors *refused* to further deliberate until they heard the court's opinion. Upon learning of the misconduct, the court undertook several precautions to minimize any chance of prejudice. The potentially biased juror was excused and replaced with an alternate juror. The remaining jurors were reinstructed on the evidence they could consider and were reminded of the limited purpose for which the murder of Rebekah Mathison could be used. The jurors were individually questioned on their ability to disregard Marie M.'s statement; each one answered that he or she would consider the case solely on the evidence adduced in the courtroom and in accordance with the given jury instructions. Finally, the jurors were instructed to begin deliberations again as if no deliberations had ever occurred; all of these precautions had been taken by the court before the

alternate juror was seated. In his posttrial affidavit, the alternate, Gerald C., stated that there was no mention of Marie M.'s statement during jury deliberations; the first time he learned of any killing of the four-year-old child was after the verdict had been rendered. We find the presumption of prejudice rebutted.

We are unpersuaded by defendant's argument that he was irreversibly prejudiced by Marie M.'s statement because her misconduct so tainted jury deliberations, none of the precautions taken by the court could possibly remove the taint. The potentially prejudiced juror was immediately replaced early in the deliberations; this distinguishes *Honeycutt,* relied on by defendant, where the juror misconduct was not discovered until after deliberations had been completed and a verdict entered. (*People* v. *Honeycutt, supra,* 20 Cal.3d at pp. 154-155; see also *People* v. *Diaz* (1984) 152 Cal.App.3d 926, 936-937 [200 Cal.Rptr. 77].) Even if the jury had been unable to disregard Marie M.'s misconduct, the bare statement that defendant had killed a four-year-old child only provided evidence that he had a predisposition to kill. Since defendant had already admitted to two persons, including his own sister, that he had raped and killed Mathews, we can find no reasonable probability of actual harm from Marie M.'s statement.

### III.

 Defendant claims prejudicial error by the court's modification, after Dr. Robbins' voir dire at trial, of its earlier ruling on the extent to which Dr. Robbins could testify. Defendant does not challenge Dr. Robbins' qualifications to testify as an expert, but argues her method of footprint analysis does not satisfy the additional requirement of reliability before expert testimony based upon the application of a new scientific technique can be admitted. (See *People* v. *Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240].) We disagree.

 In determining the underlying reliability of a new scientific technique, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." (*Ibid.,* italics omitted.) Dr. Robbins' method for footprint analysis involves a two-step process: (1) acetate tracings of the footprints to be compared are made to compare shape, and (2) the footprints are measured using at least 40 reference points or landmarks to identify points of similarity. Her work, however, is best characterized as an extension of well-established techniques traditionally used by physical anthropologists; she has incorporated 20 of the reference points for measuring length and width of a footprint developed by other anthropologists and added at least 20 of her own for measuring toes.

The major objection to Dr. Robbins' method was the inability of other anthropologists to verify or replicate her measurements because her only publication on footprint analysis did not define the reference points from which measurements had been made. Dr. Robbins was not present at the hearing on the defense's motion *in limine* to exclude her testimony. During her voir dire at trial, Dr. Robbins brought slides, used in her lectures and seminars to identify reference points and to illustrate her work, and acetate tracings of the defendant's footprint exemplar and the photographs of the bloody sockprints. In response to the court's concern about the criticism of her work, Dr. Robbins explained the published article was the result of a paper which had been presented in conjunction with the slides; the information from the slides had not been incorporated into the article. Convinced Dr. Robbins' reference points had been made definite and could be ascertained by other scientists, the court ruled she could repeat her voir dire testimony before the jury, in effect, modifying its earlier ruling. Dr. Robbins was allowed not only to testify to her measurements of the footprints but also to express her opinion on the comparison of defendant's footprint exemplar and the photographs. ▉ "The determination of 'general acceptance' is primarily a question of fact for the trial court subject to an appellate court's determination that the trial court has not abused its discretion. [Fn. omitted.]" (*People* v. *Marx* (1975) 54 Cal.App.3d 100, 109 [126 Cal.Rptr. 350, 77 A.L.R.3d 1108].) ▉ We find no abuse of discretion; the trial court properly admitted Dr. Robbins' testimony. The slide presentation was made to both the court and the jury; all of the measurements upon which Dr. Robbins based her opinion could be verified by the jury; and she did not rely on untested techniques, but on scientifically established measurement techniques.

Defendant's remaining contention that the court erred in denying him a continuance to prepare for Dr. Robbins' cross-examination is without merit. Defendant claims that he needed additional time to study the acetate tracings made by Dr. Robbins of defendant's footprint exemplar and the photographs of the sockprints. The primary issue regarding Dr. Robbins' method was her measurement technique, and, in particular, her reference points. The acetate tracings were not used to measure footprints nor were measurements taken from the tracings after they had been made. The tracings were used to compare *shape,* an aspect of Dr. Robbins' method which was not challenged as unreliable. In addition, in denying defendant's request for a continuance, the court specifically left open the possibility of a continuance after defendant had had the lunch recess to consult with the defense expert. Defendant did not renew his request after the lunch break. We find no error.

The judgment is affirmed.

King, J., concurred.

**HANING, J.,** Concurring.—The record contains substantial evidence of defendant's guilt, and he has assigned no errors on appeal which are reversible. (Cal. Const., art. VI, § 13.) I therefore concur in that portion of the majority's opinion which affirms the judgment of conviction.

A petition for a rehearing was denied April 24, 1985, and the opinion was modified to read as printed above. Haning, J., was of the opinion that the petition should be granted. The petitions of both parties for review by the Supreme Court were denied May 30, 1985.