[No. G014338. Fourth Dist., Div. Three. Feb. 27, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
REYNALDO PENEDA, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II and IV.

## COUNSEL

Leslie C. Greenbaum, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert M. Foster and Lilia E. Garcia, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SILLS, P. J.**—Reynaldo Peneda appeals his conviction for conspiracy to transport cocaine and the transportation and possession of that cocaine for sale. The jury found the total amount of cocaine exceeded 100 pounds in weight which enhanced Peneda's sentence by 15 years. He was then sentenced to a total of 21 years in prison.[1]

Peneda contends his motion to suppress evidence was erroneously denied after the trial court refused him a separate *Franks*[2] hearing. He also argues the evidence is insufficient to support his conviction as an aider and abettor to the transportation of cocaine and to support the special allegation of the cocaine's weight. He bases this latter argument on the expert's opinion that 100 pounds of cocaine was actually contained within the white powder seized by the police; the expert arrived at this conclusion through a probability calculation based on the samples taken from the whole amount. Peneda objected to this evidence, asserting the prosecution failed to comply with the *Kelly*[3] requirements for its admission. Finally, he complains that certain language in the instruction defining reasonable doubt was unconstitutional, a contention which we reject summarily (*Victor* v. *Nebraska* (1994) 511 U.S. __ [127 L.Ed.2d 583, 114 S.Ct. 1239]; *People* v. *Freeman* (1994) 8 Cal.4th 450 [34 Cal.Rptr.2d 558, 882 P.2d 249]), and affirm the judgment.

---

[1]Peneda faced a count of conspiracy to distribute cocaine, a count of transportation or sale of cocaine, and two counts of possession of cocaine. To this was added a single enhancement of the 100-pound weight (Health & Saf. Code, § 11370.4, subdivision (a)(4)) which, by its language, was to be applied to all 4 counts. Furthermore, there was a single enhancement for having *either* 28.5 grams by weight of pure cocaine or at least 57 grams of a substance containing cocaine (Pen. Code, § 1203.073, subd. (b)(1)) which was to be applied only to the two counts of cocaine possession. At sentence, the court imposed the upper term for the transportation count, enhanced by the 15 years for the 100-pound weight and added 1/3 the midterm for 1 count of possession of cocaine. *All other counts and enhancements were stayed pursuant to Penal Code section 654.*

[2]See *Franks* v. *Delaware* (1978) 438 U.S. 154 [57 L.Ed.2d 667, 98 S.Ct. 2674].

[3]See *People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] and *People* v. *Leahy* (1994) 8 Cal.4th 587 [34 Cal.Rptr.2d 663, 882 P.2d 321].

I

FACTS

A task force of law enforcement officers from various agencies in Orange County convened with the purpose of detecting major narcotics traffickers and breaking their organizations. In March 1992 one officer from this group—Armando Perez—began an undercover investigation of Peneda after observing him meet with Alfredo Berrio, a suspect already known to them as part of a major ring of drug traffickers. For the next two months, officers watched and recorded Peneda's activities, noting each of the residences he frequented, each of the vehicles he drove and each of the men he contacted.

The day after this initial meeting, the officers obtained a search warrant for Berrio's home in Anaheim Hills. The search netted over $75,000 in cash, numerous wrappers and empty boxes labeled "rolex" or "polo," as well as about 30 pounds of coffee grounds. Perez explained coffee grounds are used in cocaine trafficking to disguise the smell of large amounts of the drug during shipment.

Three addresses were repeatedly visited or used by Peneda: 1551 E. Canfield Lane (apartment 3) in Anaheim Hills; 2226 S. Batson in Rowland Heights; and 29652 Felton in Laguna Niguel. He was seen to drive a maroon Chevrolet van, a black Honda Civic and a brown Honda Accord. And during the two months of surveillance, he made close to a hundred phone calls from separate pay phones, usually via pager services. As Perez explained, the use of pager services and separate pay phones is designed to circumvent any possible wiretap and thus avoid detection by law enforcement.

A few days after the search of Berrio's home, officers saw Peneda drive the maroon van to an upholstery shop where the van's back and floor were removed and replaced with a "false" frame covered with upholstery. Perez explained this was a common method of disguising a transport used to ship large quantities of narcotics.

Three days later, Peneda drove from the Felton Street house in the maroon van to the Batson home where he parked the van in the garage, leaving the area in a different car. He drove to El Monte where he parked the car, walked over to his brown Honda Accord sitting nearby, and drove to a Cerritos mall where he met with three men, one of whom was Pedro Cordero. Cordero was also a resident of the Batson Street home.

A month later, the activity increased. Peneda left the Canfield apartment in the black Honda Civic, made 10 pay-phone calls from 10 separate phones at several different locations, then drove on to the Batson Street address. After a brief visit, he drove back to the Canfield apartment, was picked up by an older man who drove him to a storage unit in Downey and returned him to Batson Street. Peneda retrieved his brown Honda Accord from this location and drove to a gas station in Rowland Heights where he talked with Marco Serrano seated in a red Volkswagen (VW). After this contact, Peneda returned to the Batson address in the brown Honda which he parked there, switching to his maroon van. En route to the Canfield place, he made several more pay-phone calls.

The next day—May 12—Peneda met again with Serrano who was in company with Arturo Carrete in a parking lot. Another man, Angel Pacheco, arrived and joined him, driving a white Chevrolet pickup truck. Serrano and Carrete left together in the red VW; moments later, Peneda and Pacheco drove out of the lot in tandem, eventually arriving at the Batson address.

Cordero was already there and opened the garage door. Peneda parked his car, and then got into the brown Honda sitting in the driveway and drove it around the area for awhile. This maneuver permitted Pacheco to back the truck into the garage; the big door was then closed from the inside. Peneda returned with the brown Honda, parked it, got into his black Honda, drove it twice around the block and then away. One of the officers concluded the pickup was being unloaded of its drug shipment inside the garage.

An hour later, the door opened and the white pickup emerged with Pacheco in the driver's seat. He headed for the same gas station at which Serrano, Peneda and he had met the previous day, where he was detained by the officers. No narcotics were found inside the truck, although two pagers were found, one of which flashed "911" several times. Perez explained narcotics traffickers often used this as a code during a shipment that something has gone wrong.

The officers continued to watch the pickup and—just as suspected by the officers—Carrete and Serrano soon appeared. Perez indicated a "vehicle swap" was inevitable; traffickers often leave one vehicle in a public place to be picked up by other members later. This helps insulate any one person from full responsibility and makes surveillance more difficult. Carrete and Serrano were also detained.

A search pursuant to a warrant for the Batson house resulted in finding 500 kilogram "bricks" of cocaine[4] contained in 8 U-Haul boxes stacked against the rear garage wall. Each brick was the same size and shape, similarly wrapped and marked with "soccer" on the outside. Numerous other U-Haul boxes were found throughout the house.[5] A simultaneous search under the same warrant for the Canfield apartment netted 176 kilogram bricks of cocaine, wrapped and labeled with "oro." Papers with Peneda's name on them were found in the same place. The officers loaded the white pickup with the 500 bricks to transport them and found the truck was specially equipped with shocks to carry heavy loads. Peneda himself was stopped in his Honda which contained packaging tape, duct tape and new cotton gloves.

A final search of Serrano's house in Rowland Heights uncovered ledgers which Perez recognized as records of narcotics exchanges. One entry documented an exchange of 500 "kilos" set for May 12. The residence also contained identification for Carrete and Serrano as well as the red VW Serrano was driving when the officers first saw Peneda meet with him.

Thomas Matsudaira, a criminalist for the Orange County Sheriff's crime laboratory, testified he received 60 of the 500 bricks seized from the Batson Street house. Each appeared the same as all the others; he selected eight[6] which he then weighed and analyzed in detail. The 8 bricks' contents weighed a total of 8.03 kilograms; each brick individually weighed between 998 grams and 1,008 grams and each tested positive for cocaine.

Matsudaira also received 72 bricks from the 176 taken from the Canfield apartment. Again, each appeared the same as the others, and he selected six to weigh and analyze. The contents of each of the 6 tested positive for cocaine with a purity level of 82 percent; the total weight for all the contents of the 6 bricks was 6.02 kilograms, with the range of weight being between 1,002 and 1,005 grams each. (See fn. 6, *ante*.)[7] Using basic principles, Matsudaira then extrapolated there was in excess of 100 pounds of cocaine

[4]Each kilogram brick weighed about 2.2 pounds. Thus, 500 of these bricks totaled about 1,100 pounds.

[5]Along with the piles and piles of cocaine bricks, the police found and detained Pedro Cordero.

[6]The number of bricks which had to be weighed and analyzed for a confident conclusion of total weight depended on a statistical study calculation propounded by the federal Drug Enforcement Administration (DEA). Based on the measurements of this limited number of samples, Matsudaira testified there was 1 chance in 300 million that the 500 bricks did *not* contain an excess of 100 pounds of cocaine.

[7]Matsudaira employed the DEA's table and formula for confident conclusions of cocaine presence and weight; but he actually conducted more tests than the DEA required. The table was geared for a "99%" confidence level and concluded testing of four samples out of two

in the contents of the bricks found in the Batson Street house *and* in excess of 100 pounds in the bricks seized from the Canfield apartment. Actually, he calculated there was 388.8 pounds of cocaine in the Canfield address, and just over 1,100 pounds of cocaine in the Batson address. In other words, just the cocaine found in the Canfield place which had an 82 percent purity level exceeded the 100-pound minimum, whether the weight of the total amount of powder was used or just the weight of the *pure* cocaine.

Another officer, Albert Coutts, testified as an expert in the investigation of narcotics traffickers. He concluded the street value of the shipment seized from the Batson Street house was over $50 million. He also opined that both the Batson shipment and the stash found in the Canfield apartment were possessed for sale.

Peneda chose not to testify. His defense rested on attacking the prosecution theory the white pickup carried the U-Haul boxes of cocaine. His point was the garage was too small for the pickup to back in, lower its tailgate and have its contents unloaded with the door closed.

DISCUSSION

II*

*The Suppression Motion*

·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·

III

*The Criminalist's Use of a Probability Extrapolation*

Matsudaira did not weigh and analyze every grain of white powder seized from the Batson and Canfield addresses. He selected and tested a "representative sample": 8.03 kilograms out of the 500 kilograms from the Batson

---

hundred units was sufficient. Matsudaira, however, increased the confidence in the accuracy of his extrapolation by conducting tests on 14 of the 676 units, more than the DEA suggested. Although a very recent criminalist and rather unfamiliar with the background of the DEA table and formula, Matsudaira had actually tested and analyzed a full 100 pounds of cocaine in a previous case in order to testify there was, in actuality, one hundred pounds of the substance. It had taken him two weeks of constant work before he reached the 100 pounds, although he admitted it "[u]sually takes one week." In his experience, he estimates 47 "bricks" will surpass the 100 pound mark.

Matsudaira testified that the DEA table included as factors in determining the number of samples to be tested: (1) the consistency of weight between all units, and (2) "the number that [one analyzes is] positive."

*See footnote, *ante*, page 1022.

shipment and 6.02 kilograms out of the 176 kilograms from the Canfield stash.[8] He employed a table provided by the DEA which indicated how many samples from a total number contained within a single shipment must be tested to arrive at a "reliable"—i.e., within 99 percent accuracy—determination of cocaine weight and nature. This table was compiled from studies the DEA conducted, but which were unknown to Matsudaira. From this table the DEA then developed a probability formula which Matsudaira described as basic mathematics. Using this formula, he determined there was 1 chance in *300 million* that the full Batson shipment did *not* contain at least 100 pounds of cocaine.[9]

Peneda argues this probability extrapolation was a new scientific technique which the proponent failed to show met the foundational requirements of *People* v. *Kelly*, *supra*, 17 Cal.3d 24. The Attorney General responds in two ways: (1) the extrapolation Matsudaira used was not a new scientific technique, merely an established scientific technique new to courtroom use; and (2) the *Kelly* rule is no longer viable since the opinion in *Daubert* v. *Merrell Dow Pharmaceuticals* (1993) 509 U.S. __ [125 L.Ed.2d 469, 113 S.Ct. 2786]. This latter contention must be rejected because the *Kelly* rule was recently affirmed by our Supreme Court in *People* v. *Leahy*, *supra*, 8 Cal.4th 587.

It is well established that the prosecution need not prove that every grain of white powder seized in a single shipment *is* cocaine as long as cocaine is present within the single unit. (See *People* v. *Rubacalba* (1993) 6 Cal.4th 62, 65-66 [23 Cal.Rptr.2d 628, 859 P.2d 708].) The problem becomes whether the prosecution must prove, as an element of the *enhancement* under Health and Safety Code section 11370.4, subdivision (a)(4), that a full 100 pounds of cocaine was weighed and analyzed. Matsudaira testified that to do so required him, in a previous case, to work full time for two weeks to reach the one-hundred-pound mark. From his experience, he estimated that 47 "bricks" will surpass the 100-pound limit.

The prosecution also called a criminalist, John Hartmann, employed in the Orange County Sheriff's coroner's department, for his expertise in statistics. He testified he had no knowledge that this table with its number of random

---

[8]In other words, 17.666 pounds of the Batson shipment were actually weighed, representing about 1.6 percent of the total amount. Similarly, 7.244 pounds of the Canfield shipment were actually weighed, representing about 3.41 percent of the total amount.

[9]There was no discussion whether this 100 pounds of cocaine was pure or merely contained within a powder weighing at least 100 pounds; no purity analysis was ever made of the Batson Street stash.

samples and probability extrapolations by the DEA had ever been employed to prove the weight and nature of a controlled substance in a courtroom before. In order to conclusively prove the DEA's opinion, Hartmann felt one would have to actually measure all the kilograms that were seized to know the 100-pound limit was passed. The prosecution argued at trial that this was merely evidence relevant to the *weight* of Matsudaira's testimony, not to its admissibility. The prosecution also argued—based on Matsudaira's assertion that his conclusions were "basic mathematics from high school . . . or calculus . . ."—that probability calculations are not a new or novel scientific approach or technique; it was just the *number* of samples which had to be tested which was new to the courtroom.

Probability calculations are a long-established scientific method for testing theories. (See *People* v. *Soto* (1994) 34 Cal.App.4th 1588, 1597-1599 [35 Cal.Rptr.2d 846] review granted March 16, 1995 (S044043).) Although the DEA table derived from their studies was of an unknown age, the use of such extrapolations based on truly randomly selected samples is unquestionably accepted in *any* scientific community. (See Diamond, The World of Probability: Statistics in Science (1964) p. 177.) The question remains whether it is acceptable for use in the courtroom.

Of course. As in the case of three dentists' opinions that a particular defendant had bitten the murder victim's nose, based on their comparison of the defendant's teeth to the marks on the corpse, the court's admission of the expert opinion was proper. In *People* v. *Marx* (1975) 54 Cal.App.3d 100 [126 Cal.Rptr. 350, 77 A.L.R.3d 1108], the court emphasized the jury was free to accord whatever weight it felt appropriate to the expert opinion based on dental imprints. The jury could view the photographs of the compared samples and could easily follow and understand the steps used by the criminalist to draw his comparison. None of those steps involved a novel scientific theory or technique; the approach was a long-accepted way of observing physical items, applying the scientific method to those observations and deriving an opinion from them. Although the expert discussed the mathematical probabilities with another expert, he did not "engage[] in a 'trial by mathematics' (*People* v. *Collins* [(1968)] 68 Cal.2d [319] 332 [66 Cal.Rptr. 497, 438 P.2d 33, 36 A.L.R.3d 1176]) on or off the witness stand. . . ." (*Marx*, *supra*, 54 Cal.App.3d at pp. 112-113.) The difference between the prohibited use of probability calculations seen in *Collins* and that in *Marx* is the testimonial conclusion, based on statistical probability, that a defendant is *guilty* simply because of the coincidence of a number of *unrelated* facts. (E.g., *People* v. *Collins* (1968) 68 Cal.2d 319, 330-331 [66 Cal.Rptr. 497, 438 P.2d 33, 36 A.L.R.3d 1176].) The use of probability calculations as part and parcel of a scientific analysis is not "the trial by

mathematics" disapproved by *Collins*. (*People* v. *Soto, supra*, 34 Cal.App.4th at pp. 1603-1604, review granted March 16, 1995 (S044043); see *People* v. *Fierro* (1991) 1 Cal.4th 173, 215-216 [3 Cal.Rptr.2d 426, 821 P.2d 1302].)

Peneda relies on several cases which are clearly distinguishable. *In re Aontae D.* (1994) 25 Cal.App.4th 167 [30 Cal.Rptr.2d 176] centered on the attempted admission of statutorily inadmissible evidence: polygraph test results. The evidence in question was inadmissible, not because of a failure to meet the *Kelly* requirements, but because a statute prohibited its admission. The other three cases cited by Peneda—*Ross* v. *State* (Fla.Dist.Ct.App. 1988) 528 So.2d 1237, *People* v. *Hill* (1988) 169 Ill.App.3d 901 [120 Ill.Dec. 574, 524 N.E.2d 604], and *State* v. *Robinson* (Minn. 1994) 517 N.W.2d 336—are from jurisdictions unlike our own: on appeal, the standard the evidence had to meet was proof beyond a reasonable doubt, not substantial evidence.

The criminalist's use of the probability extrapolation employed here was not a new scientific theory; it was merely a step used in the chemical analysis of contraband. The fact that the actual weight was only a representative sampling of the total was relevant to the *weight* of Matsudaira's testimony, not its admissibility. The jury was free to compare the selected bricks with the rest contained in each shipment. It could then decide for itself whether the sampling was truly random.

Extrapolating from his initial argument, Peneda then concludes there is insufficient evidence to sustain the finding there were 100 pounds of cocaine. But there was *no* testimony to contradict Matsudaira's assessment of the weight being in excess of 100 pounds. Obviously, the jury listened to both Hartmann and Matsudaira and accorded more weight to their conclusion than to the defense's skepticism of their testimony. That is the jury's right. The testimony supported the ultimate conclusion: there was more than 100 pounds of pure cocaine in the Canfield stash alone. We refrain from addressing whether the enhancement under Health and Safety Code section 11370.4, subdivision (a)(4) *requires* proof of 100 pounds of *pure* cocaine; the issue is unnecessary here.

IV*

*Sufficiency of the Evidence of Aiding and Abetting*

. . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 1022.

Judgment affirmed.

Sonenshine, J., and Bedsworth, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied May 25, 1995.

---

*Judge of the Orange Superior Court sitting under assignment by the Chairperson of the Judicial Council.