Filed 1/31/14  P. v. Espinoza CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>CARLOS ESPINOZA,<br><br>　　　　Defendant and Appellant. | H038508<br>(Monterey County<br>Super. Ct. No. SS091887) |

Defendant Carlos Espinoza appeals after a jury convicted him of first degree murder (Pen. Code, § 187, subd. (a)[1]), attempted premeditated and deliberate murder (§§ 664/187, subd. (a)) and active participation in a criminal street gang (§ 186.22, subd. (a)).  The jury found that defendant committed the murder and attempted murder for the benefit of a criminal street gang (§ 186.22, subd. (b)(5)), and that in committing the murder and attempted murder, he personally used and intentionally discharged a firearm and proximately caused great bodily injury or death (§ 12022.53, subds. (b), (c), (d)).  The trial court sentenced defendant, who was 17 years old at the time he committed the offenses, to an aggregate prison term of 85 years to life.

On appeal, defendant contends:  (1) the gang crime and gang enhancements must be reversed because the gang expert's opinion was based in part on testimonial hearsay, in violation of defendant's Sixth Amendment right to confrontation; (2) the judgment

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

must be reversed due to jury misconduct because one juror visited the scene and told the other jurors what he observed; and (3) remand for resentencing is required because the sentence of 85 years to life constitutes cruel and unusual punishment in light of the fact he was a juvenile at the time he committed the offense. We agree with defendant's third claim, and we will therefore reverse the judgment and remand for resentencing.

Appellate counsel has filed a petition for writ of habeas corpus, which this court ordered considered with the appeal. In his writ petition, defendant argues that he was deprived of the effective assistance of counsel because his attorney failed to object to the gang expert's opinion testimony. We have disposed of the habeas petition by separate order filed this day. (See Cal. Rules of Court, rule 8.387(b)(2)(B).)

## BACKGROUND

### A. The Shooting

On August 6, 2009, Jose Perez was outside of his house on Terrace Street in Salinas. Perez was wearing a white t-shirt, shorts, and sneakers. He was talking to his friend Poncho, who was loaning Perez a bicycle. Perez was planning to ride the bicycle to football practice. According to his brother, Perez was not involved with gangs. Rather, he was "100 percent involved in sports," particularly football.

While Perez and Poncho stood outside, two cars turned onto Terrace Street: a gray primered Mitsubishi Galant, and a grayish-green primered Lexus. The cars stopped in front of the house. Defendant got out of the Galant, cocked a gun, and began shooting. Poncho started running. He looked back and saw Perez on the ground. He ran to a fence, then looked back again. Defendant shot at him, then shot Perez while standing over him.

Perez was later transported to the hospital, where he was declared deceased. Perez had multiple gunshot wounds, including some that had been fired at close range.

### B.    *Prior Incidents Between Poncho and Defendant*

Poncho knew defendant as "Flaco."  He knew defendant from school.  At school, defendant often engaged in "mugging" (staring at) him, and defendant would sometimes bump into him.  Defendant had chased Poncho on two prior occasions.  First, about three months before the shooting, defendant was in a car that tried to run Poncho over.  Then, about one and a half months before the shooting, defendant chased Poncho while driving.

Poncho knew that defendant hung out with Sureños and that defendant considered Poncho to be associated with Norteños.  Poncho denied he was in fact a gang member but admitted he had a close family member who was in a Norteño gang.  Poncho also admitted he had a tattoo of the word "Salas" on his back and that he previously had the roman numerals XIV on his hand.

### C.    *Coparticipant Testimony*

Julio Montoya Luna (Montoya), Juan Nunez, and Antonio Gayoso were coparticipants in the shooting of Perez.  Montoya and Gayoso were members of the Mexican Pride Locos, a Sureño gang.  Nunez and defendant were associated with the Vagos, a another Sureño gang.

Montoya and Nunez both entered into agreements with the prosecution, pursuant to which each pleaded guilty to being an accomplice and a gang member in exchange for testifying against defendant.[2]

Montoya and Nunez both testified about defendant's tattoos, which included the number 22 and the phrase " 'One Way.' "  To get a tattoo of the number 22, which represents "V," the 22nd letter of the alphabet, a Vagos gang member must do a shooting. " 'One Way' " refers to a street in the Vagos territory.

---

[2] Gayoso did not testify at defendant's trial.  In 2010, he was sentenced to a prison term of 25 years to life after he pleaded guilty to first degree murder (§187, subd. (a)) and admitted that the crime was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

Montoya and Nunez also testified about the Perez shooting. Earlier that day, a Sureño gang member named "Shaggy" had been shot. Afterwards, Nunez, defendant and other Sureño gang members had a discussion about how to respond. Nunez said he "could be the one" to do a retaliatory shooting; he wanted to "look good." Six of the Sureño gang members went looking for Norteños. They "didn't find anyone," although Nunez and two other Sureño gang members shot at a house where Norteños lived.

Nunez and defendant eventually went to the location of Shaggy's shooting. Gayoso approached Nunez, angry about the shooting. Defendant indicated that he had a gun and asked Gayoso "what did he want to do." Defendant borrowed a sweatshirt and gloves, then asked Nunez to "go with him to go riding," meaning to go find "someone to shoot at." Nunez called Montoya over and said, " 'The homies are going to go do some riding. Do you want to go?' " Montoya understood this meant that they were going to look for rival Norteños.

Montoya drove one car with Nunez as his passenger. They followed Gayoso, who was driving another car with defendant as his passenger. At Terrace Street, defendant got out and fired his gun at Perez and Poncho. According to Montoya, defendant shot Perez three or four times, then kicked him, then fired the gun three or four more times. Nunez heard about six shots. He saw defendant shoot at Perez when Perez was on the ground.

Both cars drove away from the scene. Defendant and Nunez subsequently switched cars: Nunez got into Gayoso's car, and defendant got into Montoya's car. Defendant left the sweatshirt he had been wearing in Gayoso's car.

When Montoya and defendant were later arrested and transported to jail, defendant told him, " 'Don't worry. They have nothing against us.' " Defendant later instructed Montoya to " 'just say that it was someone else. That it wasn't me.' " Defendant told Montoya to invent a nickname and say the person had gone to Mexico.

4

At the time of the Perez shooting, both defendant and Nunez had no hair. They were about the same size and build.

### D. Gang Expert

Salinas Police Officer Robert Zuniga testified as the prosecution's gang expert. He worked in the gang unit's street enforcement group and had previously worked as a gang intelligence officer. He contacted gang members on a daily basis. He had obtained information about gangs from confidential reliable informants and other gang experts. In preparation for testifying in this case, he had reviewed documentation such as crime reports and field interview cards.

According to Officer Zuniga, Perez had no documented gang contacts. Officer Zuniga believed that Poncho and his brother were both active Norteño gang members, and that Gayoso, Montoya, Nunez, and defendant were all active Sureño gang members at the time of the Perez shooting.

Officer Zuniga explained why he believed defendant was an active Sureño gang member. First, he referred to defendant's tattoos, which included the number 22 and the phrases " 'One Way,' " " 'Most Wanted,' " and " 'Salinas Finest.' " Second, when defendant was arrested, he was in the company of other Sureño gang members, including two Sureño gang members who were hiding in a restroom, where a loaded firearm was found. Third, defendant had made a statement at juvenile hall to the effect that he was "not ready to leave the gang lifestyle." He had previously stated that he had been associating with Sureño gang members since the age of 13.
Fourth, defendant had been involved in a number of prior incidents (including a prior incident in which shots were fired at an elementary school), during which he was associating with Sureño gang members. Fifth, defendant had been housed with Sureño gang members in jail.

Officer Zuniga testified that the primary activities of the Sureño gang are "a variety of crimes," including homicides, shootings, carjackings, robberies, and burglaries.

The prosecution established that Sureño gang members had engaged in a "pattern of criminal gang activity" (see § 186.22, subds. (a), (e), (f)) by introducing court documents showing criminal convictions for enumerated offenses and eliciting Officer Zuniga's testimony about each crime. The documents and testimony established the following.

First, on January 12, 2009, two Sureño gang members challenged some Norteño gang members, then "opened fire," killing one of the Norteño gang members. The two Sureño gang members were both convicted of homicide.

Second, on August 10, 2008, a Sureño gang member entered a market, where he brandished a BB gun and asked the clerk for "all of the money." He was convicted of robbery.

Third, on February 25, 2007, two Sureño gang members fired guns at some Norteño gang members. They were found with a loaded firearm in their vehicle and were convicted of attempted murder and malicious shooting from a vehicle.

Fourth, on February 11, 2007, a Sureño gang member was in a vehicle with another Sureño gang member; a loaded firearm was found under his seat. He was convicted of carrying a loaded firearm in his vehicle.

Fifth, on May 15, 2006, a Sureño gang member got into an argument with some Norteño gang members inside of a 7-Eleven, then shot and killed one of the Norteño gang members. He was convicted of homicide.

Given a hypothetical situation based on the facts of this case, Officer Zuniga opined that the crime was committed for the benefit of and in association with the Sureño gang, and that it promoted, furthered, and assisted the commission of criminal conduct by the Sureño gang.

### E.     Defense Case

The defense theory was that Nunez, not defendant, shot Perez. This theory was based primarily on testimony from Guadelupe Gastelum, an independent eyewitness.

6

Gastelum was visiting friends on Terrace Street at the time of the Perez shooting. He was standing in the street, talking to a friend, when he heard and saw a Mitsubishi Galant turn onto the street. He saw a male exit from the car and shoot at Perez. Gastelum estimated that he was about 300 to 320 feet away from the shooter. His location was about three houses down the street. When the shooter moved closer to Perez, Gastelum's vision was blocked by a fence.

According to Gastelum, the shooter wore a black shirt and blue pants. The shooter was bald and was not wearing a hat. The shooter's sweatshirt might have had a hood, but the hood was not on the shooter's head.[3]

Later that evening, Gastelum was brought to an infield show-up, where he viewed Nunez and Gayoso. He identified Nunez as the shooter, recognizing him because he was bald, wore a black shirt, and had the same build and skin color as the shooter. Gastelum identified Gayoso as the driver. The officer accompanying Gastelum to the show-up opined that Gastelum seemed "very sure" of his identifications.

### F. Charges, Trial, and Sentencing

Defendant was charged with first degree murder (§ 187, subd. (a); count 1), attempted premeditated and deliberate murder (§§ 664/187, subd. (a); count 2) and active participation in a criminal street gang (§ 186.22, subd. (a); count 3). The District Attorney alleged that defendant committed the murder and attempted murder for the benefit of a criminal street gang (§ 186.22, subd. (b)(5)), and that he personally used and intentionally discharged a firearm and proximately caused great bodily injury or death (§ 12022.53, subds. (b), (c), (d)). The jury convicted defendant of all three charged offenses and found true all of the special allegations.

---

[3] Gastelum's description of the shooter was somewhat inconsistent with Poncho's description. According to Poncho, defendant wore dark pants, a baseball cap, and a hooded sweatshirt.

7

For count 1 (murder), the trial court imposed a term of 25 years to life, with a consecutive term of 25 years to life for personally and intentionally discharging a firearm and proximately causing death or great bodily injury (§ 12022.53, subd. (d)). For count 2 (attempted murder), the trial court imposed a consecutive term of 15 years to life, with a consecutive 20-year term for personally and intentionally discharging a firearm (§ 12022.53, subd. (c)), but it stayed a 10-year term for personally using a firearm (§ 12022.53, subd. (b)). The trial court stayed count 3 (active participation in a criminal street gang) pursuant to section 654. Defendant's aggregate sentence was 85 years to life.

## DISCUSSION

### A.    *Gang Expert Testimony*

Defendant contends that certain opinion testimony by Officer Zuniga was based on testimonial hearsay and that its admission violated his Sixth Amendment right to confront witnesses. (See *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).) Defendant contends that the admission of the testimony was prejudicial as to count 3 (active participation in a criminal street gang) and the gang enhancements found true as to counts 1 and 2.

Specifically, defendant refers to three areas of Officer Zuniga's expert opinion testimony: (1) the testimony establishing a pattern of criminal gang activity by Sureño gang members; (2) the testimony about the primary activities of Sureño gang members; and (3) the testimony about defendant's statements and membership in the Sureño gang. According to defendant, Officer Zuniga's testimony about these topics was based on "police investigations and interviews conducted by others who did not testify." Defendant contends that such "basis evidence" (see *People v. Hill* (2011) 191 Cal.App.4th 1104, 1127 (*Hill*)) was offered for its truth, was testimonial, and should have been excluded. However, defendant did not present such arguments below.

8

## 1.    Forfeiture

In general, a defendant forfeits a confrontation claim by failing to object below. (See *People v. Redd* (2010) 48 Cal.4th 691, 730.)  Defendant acknowledges that he "did not object to [Officer] Zuninga's [sic] testimony on Sixth Amendment or state hearsay grounds," but he contends the issue was not forfeited because an objection would have been futile in light of the case law at the time of trial.  (See *People v. Sandoval* (2007) 41 Cal.4th 825, 837, fn. 4 [objection not required "if it would have been futile" in light of binding authority at the time].)  Defendant notes that at the time of trial, California courts had uniformly rejected confrontation clause challenges to "basis evidence" from a gang expert.  (E.g., *Hill, supra,* 191 Cal.App.4th at p. 1131; *People v. Sisneros* (2009) 174 Cal.App.4th 142, 153; *People v. Ramirez* (2007) 153 Cal.App.4th 1422, 1427; *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1209.)

The Attorney General contends that an objection would not necessarily have been overruled.  Officer Zuniga testified on April 10 and 11, 2012.  The Attorney General points out that two weeks earlier, the California Supreme Court had granted review in a case presenting this issue.  (See *People v. Archuleta* (2011) 202 Cal.App.4th 493, review granted March 28, 2012, S199979, review dismissed May 22, 2013.)  The Attorney General further points out that similar confrontation clause issues were pending in the California Supreme Court and United States Supreme Court.  (See, e.g., *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*) [statements in autopsy report describing condition of murder victim's body]; *Williams v. Illinois* (2012) 567 U.S. __, 132 S.Ct. 2221, 183 L.Ed.2d 89 (*Williams*) [expert's reliance on DNA laboratory report].)

Defendant contends that if an objection was required to preserve this issue for appeal, trial counsel was ineffective for failing to object below.

We will assume that the confrontation clause argument was not forfeited and address the merits, as we would likely need to do if we considered the issue under the

9

prism of defendant's ineffective assistance claim.  (See *People v. Osband* (1996) 13 Cal.4th 622, 693.)

## 2.    Confrontation Clause and "Basis Evidence"

"The Sixth Amendment to the United States Constitution guarantees the accused in criminal prosecutions the right 'to be confronted with the witnesses against him.'  In *Crawford v. Washington* (2004) 541 U.S. 36 [(*Crawford*)] . . . , the high court held that this provision prohibits the admission of out-of-court *testimonial* statements offered for their truth, unless the declarant testified at trial or was unavailable at trial and the defendant had had a prior opportunity for cross-examination.  [Citations.]"  (*People v. Livingston* (2012) 53 Cal.4th 1145, 1158 (*Livingston*).)

"In *Davis v. Washington*[ (2006)] 547 U.S. 813 [(*Davis*)], the court explained the difference between testimonial and nontestimonial statements made to the police.  'Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.'  [Citations.]"  (*Livingston, supra,* 53 Cal.4th at pp. 1158-1159.)

Recently, the United States Supreme Court considered whether "basis evidence" —that is, evidence that provides a basis for an expert opinion—is admissible under the confrontation clause.  (*Williams, supra,* 567 U.S. at p. ___ [132 S.Ct. at p. 2240].)  In *Williams,* the question was, "does *Crawford* bar an expert from expressing an opinion based on facts about a case that have been made known to the expert but about which the expert is not competent to testify?"  (*Id.* at p. ___ [132 S.Ct. at p. 2227].)  The *Williams* court examined whether a laboratory expert could rely on a DNA report from a prior criminal case in rendering his opinion that the defendant's DNA profile matched the prior

sample. In a 4-1-4 opinion, the court held that admission of the expert's testimony did not violate the confrontation clause.

A plurality of the *Williams* court found two grounds for admitting the expert testimony over the defendant's confrontation clause objection. First, the "basis evidence" was not offered for its truth: "Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause." (*Williams, supra,* 567 U.S. at p. ___ [132 S.Ct at p. 2228] (plur. opn. of Alito, J., joined by Roberts, C. J., Kennedy & Breyer, JJ.).) However, the other five justices disagreed with the plurality on this point, finding that the "basis evidence" *was* offered for its truth. (See *id.* at p. ___ [132 S. Ct. at p. 2257] (conc. opn. of Thomas, J.) ["statements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose"]; *id.* at p. ___ [132 S.Ct. at p. 2268] (dis. opn. of Kagan, J., joined by Scalia, Ginsburg, and Sotomayor, JJ.) [expert's statements about the DNA report "went to its truth, and the State could not rely on her status as an expert to circumvent the Confrontation Clause's requirements"].)

The *Williams* plurality also found that even if the "basis evidence" was offered for its truth, it was not testimonial. (*Williams, supra,* 567 U.S. at p. ___ [132 S.Ct at p. 2228] (plur. opn. of Alito, J., joined by Roberts, C. J., Kennedy & Breyer, JJ.).) The DNA report was "produced before any suspect was identified," it was sought "for the purpose of finding a rapist who was on the loose" rather than to obtain evidence against the defendant, and it was "not inherently inculpatory." (*Id.* at p. ___ [132 S.Ct at p. 2228].) Justice Thomas agreed with the plurality on this point, finding that the "basis evidence" was not testimonial because it "lack[ed] the solemnity of an affidavit or deposition" and, "although the report was produced at the request of law enforcement, it was not the product of any sort of formalized dialogue resembling custodial interrogation." (*Id.* at p. ___ [132 S.Ct. at p. 2260] (conc. opn. of Thomas, J.).)

11

The California Supreme Court has not yet considered whether the confrontation clause prohibits a gang expert from relying on hearsay to establish whether a particular gang meets the definition of a criminal street gang and to provide evidence that a particular crime was committed for the benefit of a gang. However, in *People v. Gardeley* (1996) 14 Cal.4th 605, 618-619 (*Gardeley*), the court reasoned that, "[c]onsistent with [the] well-settled principles" concerning expert witness testimony, a detective "could testify as an expert witness and could reveal the information on which he had relied in forming his expert opinion, including hearsay." (*Id.* at p. 619.) *Gardeley* reasoned that gang experts can rely on inadmissible hearsay because such evidence is not offered as " 'independent proof' of any fact." (*Ibid.*)

Defendant contends that this aspect of *Gardeley* is no longer valid in light of the recent developments in confrontation clause jurisprudence, including *Crawford* and *Williams.*

In *Hill*, *supra*, 191 Cal.App.4th 1104, Division Five of the First District Court of Appeal likewise questioned the ongoing validity of *Gardeley*'s holding that evidence relied on by a gang expert is not offered for its truth. The *Hill* court noted that in many cases, an expert's opinion is meaningful only if the jury finds its basis true. (*Id.* at p. 1131.) The *Hill* court discussed the possibility that the California Supreme Court would reconsider *Gardeley* and conclude that "basis evidence is offered for its truth." (*Id.* at p. 1132.) However, the *Hill* court held that it was required to "follow *Gardeley* and the other California Supreme Court cases in the same line of authority." (*Id.* at p. 1131, fn. omitted.) The court thus concluded that the trial court had properly allowed a gang expert to relate "basis evidence" because the out-of-court statements were not admitted for their truth. (*Ibid.*)

The *Hill* court further determined that even if the basis evidence in that case was offered for its truth, the confrontation clause would still permit most of the testimony. (*Hill, supra*, 191 Cal.App.4th at p. 1135.) For instance, the confrontation clause did not

12

bar the gang expert from relying on statements by a deceased gang member who had spoken to the expert "in an informal, unstructured setting" that was not part of the investigation into the defendant's crime. (*Ibid.*) The gang expert also could properly testify about statements by gang members who were in custody, because the interviews were not conducted as "part of a specific criminal investigation" or for the primary purpose of establishing " 'some past fact for possible use in a criminal trial.' [Citation.]" (*Id.* at p. 1136.)

### 3. Analysis

As an intermediate court, we are required to follow *Gardeley*'s holding that the "basis evidence" was not offered as " 'independent proof' of any fact." (*Gardeley, supra,* 14 Cal.4th at p. 619; see *Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455.)

Moreover, even if we accept the premise that here, the out-of-court statements were offered for the truth, it appears that most, if not all, of the "basis evidence" was "nontestimonial" under any of the definitions in the recent confrontation clause cases. (See *Crawford, supra,* 541 U.S. at p. 59 [declining to give a comprehensive definition of "testimonial" but stating that at a minimum, it includes prior testimony and police interrogations]; *Davis, supra,* 547 U.S. at p. 822 [statements are testimonial when "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution"]; *Dungo, supra,* 55 Cal.4th at p. 619 [in addition to the "primary purpose" requirement, to be testimonial, a statement "must be made with some degree of formality or solemnity"].)

We first note that Officer Zuniga was never asked to specify the basis of his knowledge for any specific facts. We are hesitant to presume, as defendant does, that Officer Zuniga relied on testimonial statements in rendering his opinions. In the absence of a timely and specific objection to a particular statement on confrontation grounds, which places the burden on the government to establish the admissibility of the statement

13

(see *Idaho v. Wright* (1990) 497 U.S. 805, 816), reviewing courts should not presume that an out-of-court statement given to a law enforcement officer under unclear circumstances, possibly without testimonial purpose, is testimonial. (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [error must be affirmatively shown].)

We further note that according to Officer Zuniga, much of the information he based his opinions on came from his work as a gang intelligence officer. His testimony was largely based on contacts with gang members, confidential reliable informants, and other gang experts. Nothing in the record suggests, let alone establishes, that this information was given in a way that bore any degree of solemnity or formality (see *Williams, supra,* 567 U.S. at p. ___ [132 S.Ct. at p. 2260] (conc. opn. of Thomas, J.); *Dungo, supra,* 55 Cal.4th at p. 619) or was provided through any kind of formal interrogation. (See *Davis, supra,* 547 U.S. at p. 822.) Additionally, nothing in the record indicates that the primary purpose of Officer Zuniga's information-gathering was to target defendant or any other individuals, to investigate a particular crime, or to establish past facts for a later specific criminal prosecution. (See *ibid*.) The fact that Officer Zuniga used the information in defendant's case does not mean that he obtained the information for that primary purpose.

Officer Zuniga also relied on defendant's own statements about his membership in the Sureño gang. His reliance on defendant's admissions does not violate the confrontation clause. (See *United States v. Moran* (9th Cir. 1985) 759 F.2d 777, 786 ["Since the out of court statements introduced through these documents were made by Moran himself, he can claim no confrontation clause violation."]; *United States v. Brown* (11th Cir. 2006) 441 F.3d 1330, 1358-1359 [admission of defendant's own statements does not violate the confrontation clause].)

Similarly, to the extent Officer Zuniga relied on the court records showing other Sureño gang members' criminal convictions, those court records did not constitute testimonial evidence as described in *Crawford*. (See *Crawford, supra,* 541 U.S. 36, at

14

pp. 51-52, 68.) They were admissible as official records and hence reliance on them did not give rise to a confrontation clause violation. (See *id.* at p. 56; *People v. Taulton* (2005) 129 Cal.App.4th 1218, 1225 [records that are "prepared to document acts and events relating to convictions and imprisonments" are beyond the scope of *Crawford*].)

Defendant's primary argument is that Officer Zuniga improperly relied on statements in police reports, which were presumably taken during police investigations for the primary purpose of establishing or proving "past events potentially relevant to later criminal prosecution." (*Davis, supra,* 547 U.S. at p. 822.) He surmises that Officer Zuniga relied on such police reports for details about the crimes establishing the requisite "pattern of criminal gang activity." (See § 186.22, subds. (a), (e), (f).) However, because there was no objection below, we cannot determine whether any particular statement was made in response to police interrogation, as opposed to being made in an emergency context. (See *Davis, supra,* 547 U.S. at p. 822.)

Even assuming that the police reports included testimonial hearsay, the record does not establish the extent to which Officer Zuniga's opinions relied on police reports. It appears he relied on the police reports only to provide details about the crimes that were committed by other Sureño gang members. These details were unnecessary to prove the gang crime or the gang enhancement, however. For purposes of section 186.22, the predicate offenses required to establish a " 'pattern of criminal gang activity' " need not be " 'gang related.' " (*Gardeley, supra,* 14 Cal.4th at p. 621.) Rather, the " 'pattern' " is established by evidence that members of the gang "individually or collectively have actually engaged in 'two or more' acts of specified criminal conduct committed either on separate occasions or by two or more persons." (*Id.* at p. 623.) Thus, any error in admitting Officer Zuniga's testimony about the police reports was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

### B.    Jury Misconduct

During the initial jury deliberations, a juror visited the scene of the Perez shooting and told the other jurors that it would have been difficult to make an identification from Gastelum's location.  The trial court held a hearing and determined that the juror had committed misconduct, but that there was no prejudice.  The trial court replaced the juror with an alternate and instructed the jury to begin deliberations anew and disregard anything that the juror had said.  The trial court denied defendant's motion for a mistrial and his later motion for a new trial.

Defendant contends that the trial court erred by finding that the jury misconduct was not prejudicial.

### 1.    Proceedings Below

The jury began deliberating on the afternoon of Friday, April 13, 2012.  The jurors retired to deliberate at 3:06 p.m. and were excused at 4:45 p.m.

On Monday, April 16, 2012, the jury resumed deliberations at 9:00 a.m.  At 9:15 a.m., the jury sent the trial court a note stating, "[Juror No. 55] went to the location of [the] shooting on Thurs. evening before the beginning of deliberations.  No one was swayed by his statement."

The trial court indicated it believed that Juror No. 55 had committed misconduct and proposed that Juror No. 55 be removed.  Defendant agreed there had been juror misconduct and requested a mistrial. The prosecutor advocated for a hearing to determine whether the misconduct was prejudicial.

The trial court called in Juror No. 55, who admitted he had gone to the scene of the shooting, out of "curiosity."  He told the other jurors that he "went over there," and he said "that it was difficult to see what was happening when you're too far from there, from the street."  Juror No. 55 had gone to the scene the prior Thursday, and he told the other jurors about his visit the next day.  None of the other jurors said anything in response to his comment:  "They just listened."

16

The trial court then called in the jury foreperson. The trial court asked if the other jurors had discussed Juror No. 55's comment. The foreperson indicated that some of the jurors had expressed "shock that he had done it" because of the trial court's admonition not to go to the scene.[4] The foreperson continued, "But nobody -- basically the point he brought up everybody had already decided on that point. Do I say what that point is or --" The trial court responded, "I don't think you need to."

The trial court asked, "Did the comment made by Juror Number 55 result in a conversation that would -- that [was] a part of your deliberations?" The foreperson responded, "No. Not really, no." The foreperson said that the jury had only discussed whether or not to report the incident to the court.

The trial court asked the foreperson to describe Juror No. 55's comment. The foreperson stated, "That he went to the location. Took a look from the point of view of Mr. G and said he didn't think that Mr. G could see that far to be able to identify a face." Juror No. 55 continued, "But everybody else had already made that decision, that we agreed that we did not believe that --" The trial court interrupted, saying, "I don't want to invade the province of the jury at this point."[5]

Defendant reiterated his request for a mistrial. The trial court denied the request and decided, instead, to dismiss Juror No. 55, admonish the remaining jurors, and bring in an alternate juror. The trial court explained the basis for its ruling: "The jurors did deliberate for over an hour on Friday. . . . And it appears to the Court that Juror Number

---

[4] At both the beginning and end of trial, the trial court had instructed the jury not to "visit the scene of any event involved in this case." (See CALCRIM Nos. 101, 201.)

[5] Evidence Code section 1150, subdivision (a) provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

17

55 on Friday revealed that he had been to the scene of the event. And he quickly was told by the rest of the jurors that that was not an okay thing to do. . . . It does not appear that there were any discussions other than that was not an okay thing to do that were held between the other jurors regarding the comments that Juror [No.] 55 made."

After dismissing Juror No. 55, the trial court admonished the remaining jurors as follows: "It is the Court's understanding that the -- there may have been a comment by a juror on information that he received from outside of the trial. So as trial jurors, the important thing for you to do is only deliberate and only consider the evidence that was received at trial. Anything that is received outside of the courtroom or seen or viewed or told to you outside of the courtroom is not to be considered at trial. And I will tell you specifically if you heard any comments made by Juror [No.] 55 regarding anything that he said or any information that he received either by viewing himself or heard from someone else outside of the trial is not to be considered by you." The trial court told the jurors that anything they heard from Juror No. 55 should be treated as "evidence that's stricken during the trial" and "should not be considered by you for any purpose."

The trial court suspended deliberations until the alternate juror could be brought in. When the alternate joined the jury, the trial court instructed the jurors that "the jury deliberation process begins anew." The jury reached its verdicts later that day.

Defendant subsequently brought a motion for a new trial based on the jury misconduct. The trial court denied the motion on June 21, 2012, finding that there was no prejudice.

### 2. Analysis

Due process requires a jury be " 'capable and willing to decide the case solely on the evidence before it . . . .' [Citations.]" (*People v. Nesler* (1997) 16 Cal.4th 561, 578 (*Nesler*), italics omitted.) Thus, "[j]uror misconduct, such as the receipt of information about a party or the case that was not part of the evidence received at trial, leads to a

18

presumption that the defendant was prejudiced thereby and may establish juror bias." (*Ibid.;* see also *In re Hitchings* (1993) 6 Cal.4th 97, 119 (*Hitchings*).)

"When juror misconduct involves the receipt of information about a party or the case from extraneous sources, the verdict will be set aside only if there appears a substantial likelihood of juror bias. [Citation.] Such bias may appear in either of two ways: (1) if the extraneous material, judged objectively, is so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror; or (2) even if the information is not 'inherently' prejudicial, if, from the nature of the misconduct and the surrounding circumstances, the court determines that it is substantially likely a juror was 'actually biased' against the defendant." (*Nesler, supra,* 16 Cal.4th at pp. 578-579.)

The presumption of prejudice arising from juror misconduct " 'may be rebutted by proof that no prejudice actually resulted.' [Citations.]" (*Hitchings, supra,* 6 Cal.4th at p. 118.) More specifically, the presumption of prejudice " ' "may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party [resulting from the misconduct]. . . ." ' [Citations.]" (*Id.* at p. 119.) On appeal, whether prejudice arose from juror misconduct "is a mixed question of law and fact subject to an appellate court's independent determination. [Citations]." (*Nesler, supra,* 16 Cal.4th at p. 582.)

In this case, defendant contends the jury misconduct was "so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror." (*Nesler, supra,* 16 Cal.4th at pp. 578-579.) The test for inherent bias "is analogous to the general standard for harmless error analysis under California law. Under this standard, a finding of 'inherently' likely bias is required when, but only when, the extraneous information was so prejudicial in context that its erroneous introduction in the trial itself would have warranted reversal of the judgment. Application of this 'inherent prejudice' test

19

obviously depends upon a review of the trial record to determine the prejudicial effect of the extraneous information." (*In re Carpenter* (1995) 9 Cal.4th 634, 653 (*Carpenter*).)

We disagree that the information conveyed by Juror No. 55 was "so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror." (*Nesler, supra,* 16 Cal.4th at pp. 578-579.) Although the accuracy of Gastelum's identification was an important issue at trial, Juror No. 55's misconduct did not "completely undermine[]" the defense case, as defendant claims. The evidence had already established that Gastelum had viewed the scene from a distance of at least 300 feet and that his view was obscured when defendant shot at Perez from close range.[6] The evidence had also established that someone could have confused defendant and Nunez from such a distance, due to their similarities in size, build, and hairstyle. Additionally, pictures of the scene and Gastelum's location were introduced into evidence, so the jurors were able to assess the distance for themselves. (See *People v. Sutter* (1982) 134 Cal.App.3d 806, 821 [juror's description of her visit to the scene could not "possibly have added anything to what the jurors already knew" because of pictures introduced into evidence].) Thus, although Juror No. 55 committed misconduct, he did not introduce any evidence into the jurors' deliberations that was "so prejudicial in context that its erroneous introduction in the trial itself would have warranted reversal of the judgment." (*Carpenter, supra,* 9 Cal.4th at p. 653.)

Next, we consider whether it is "substantially likely a juror was 'actually biased' against the defendant." (*Nesler, supra,* 16 Cal.4th at pp. 578-579; see also *Carpenter, supra,* 9 Cal.4th at p. 654.) Under this test, " '[t]he presumption of prejudice may be rebutted, inter alia, by a reviewing court's determination, *upon examining the entire record,* that there is no substantial likelihood that the complaining party suffered actual

_____

[6] During argument to the jury, the prosecutor discredited Gastelum's identification of Nunez. He argued that Gastelum was too far from the shooting to make an accurate identification: "You can't see from that far away anybody's face."

20

harm.' [Citation.]" (*Carpenter, supra,* 9 Cal.4th at p. 654.) "In an extraneous-information case, the 'entire record' logically bearing on a circumstantial finding of likely bias includes the nature of the juror's conduct, the circumstances under which the information was obtained, the instructions the jury received, the nature of the evidence and issues at trial, and the strength of the evidence against the defendant." (*Ibid.*)

Courts have often found that the presumption of prejudice arising from juror misconduct was rebutted because the trial court was apprised of the misconduct during deliberations and was able to implement "curative measures such as the replacement of the tainted juror with an alternate or a limiting instruction or admonition." (*People v. Holloway* (1990) 50 Cal.3d 1098, 1111; see also *People v. Dorsey* (1995) 34 Cal.App.4th 694, 704 [presumption of prejudice rebutted where trial court replaced the offending juror and instructed the jury to begin deliberations anew].) For instance, in *People v. Knights* (1985) 166 Cal.App.3d 46 (*Knights*), during deliberations, a juror learned that the defendant had previously killed a four-year-old child, and she told the rest of the jury what she had heard. The presumption of prejudice was rebutted, however, because "the misconduct occurred early in the deliberations" and was quickly brought to the court's attention by the foreperson. (*Id.* at p. 51.) "The potentially biased juror was excused and replaced with an alternate juror," and the remaining jurors "were instructed to begin deliberations again as if no deliberations had ever occurred." (*Ibid.*)

On this record, we find that the presumption of prejudice arising from Juror No. 55's misconduct was rebutted. Considering the nature of the jury misconduct and the fact that the extraneous material was not inconsistent with other evidence at trial, there was " 'no substantial likelihood' " that defendant " 'suffered actual harm' " from the jury misconduct. (*Carpenter, supra,* 9 Cal.4th at p. 654.) Further, in this case, similar to *Knights,* "the misconduct occurred early in the deliberations" and was quickly brought to the court's attention by the foreperson. (*Knights, supra,* 166 Cal.App.3d at p. 51.) "The potentially biased juror was excused and replaced with an alternate juror." (*Ibid.*) The

21

remaining jurors were instructed not to consider anything Juror No. 55 said, and they "were instructed to begin deliberations again as if no deliberations had ever occurred." (*Ibid.*) Under the circumstances, it is not "substantially likely a juror was 'actually biased' against the defendant." (*Nesler, supra,* 16 Cal.4th at p. 579.)

### C. Sentencing

Defendant contends that his sentence of 85 years to life is "the equivalent of life without parole," which constitutes cruel and unusual punishment because he was a juvenile (age 17) at the time he committed the offense.

Defendant primarily relies on two recent decisions. First, he relies on *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455] (*Miller*), where the United States Supreme Court held that the Eighth Amendment bars imposition of a mandatory sentence of life without the possibility of parole (LWOP) for a juvenile homicide defendant. Second, he relies on *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), where the California Supreme Court held—in the context of a juvenile nonhomicide offense—that a sentence of "a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy" is the functional equivalent of a LWOP sentence. (*Id.* at p. 268.)

The Attorney General argues that defendant forfeited his cruel and unusual punishment claim by failing to object below on that ground. The Attorney General alternatively argues that this claim can only be brought in a petition for writ of habeas corpus filed in the trial court. On the merits, the Attorney General contends that defendant's sentence was not cruel and unusual.

### 1. Proceedings Below

The probation report reflected that defendant not only maintained his innocence, but he claimed to know " 'nothing' " about the offense. It further reflected that defendant's family (his mother, father, and two younger siblings) lived in Mexico, that

22

defendant had completed the 11th grade, that he had used alcohol once, and that he denied using drugs.

The probation report also reflected that defendant's juvenile criminal history began in May of 2005, when he committed an attempted burglary, vandalism, theft, and resisting arrest. He violated probation twice in 2005, once in 2006, twice in 2007, three times in 2008, and twice in 2009. Some of the probation violations involved the commission of new offenses. In 2009, defendant absconded from a placement. Additionally, defendant had been subject to four disciplinary reports while in jail for the present offense.

At the sentencing hearing, defendant requested the trial court impose concurrent terms for the murder and attempted murder, arguing that they constituted "one incident." He also claimed he was innocent.

The trial court responded, "[Y]ou murdered a young 15-year old in cold blood." For count 1 (murder), the trial court imposed a term of 25 years to life, with a consecutive term of 25 years to life for personally and intentionally discharging a firearm and proximately causing great bodily injury or death, pursuant to section 12022.53, subdivision (d). For count 2 (attempted murder), the trial court imposed a consecutive term of 15 years to life, with a consecutive 20-year term for personally and intentionally discharging a firearm, pursuant to section 12022.53, subdivision (c).

The trial court noted that it had found a number of factors in aggravation, which applied to defendant's conviction of actively participating in a criminal street gang (count 3). Although it stayed the term for that conviction pursuant to section 654, the trial court noted its findings: (1) the crime involved great violence, great bodily injury, and a high degree of cruelty, viciousness, and callousness; (2) the victims were particularly vulnerable; (3) the crime involved planning; (4) defendant had a continuing relationship with a criminal street gang; (5) defendant's violent conduct indicated he was a serious danger to society; (6) defendant was the subject of prior sustained juvenile petitions,

23

indicating an escalation in his criminal conduct; (7) defendant had a significant juvenile criminal history; (8) prior efforts at rehabilitation had been unsuccessful; and (9) defendant's prior performance on probation had been unsuccessful. In deciding to impose consecutive sentences for the murder and attempted murder, the trial court made findings that (1) the victims were particularly vulnerable and (2) the incidents were separate, since defendant had fired numerous shots.

### 2. Forfeiture

As noted above, the Attorney General argues that defendant forfeited his cruel and unusual punishment claim by failing to object below on that ground. Defendant points out that he was sentenced on June 21, 2012—prior to both the *Miller* and *Caballero* decisions.[7] We agree that because there was no California or United States Supreme Court case on point at the time of sentencing, this issue was not forfeited by defendant's failure to raise it below. (See *People v. Black* (2007) 41 Cal.4th 799, 810 [forfeiture rule does not apply when "the pertinent law" changes unforeseeably].)

### 3. Procedure for Raising Issue

Citing *Caballero,* the Attorney General also argues that defendant's claim can only be brought in a petition for writ of habeas corpus filed in the trial court.

As noted above, in *Caballero,* the California Supreme Court held that "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment." (*Caballero, supra,* 55 Cal.4th at p. 268.) The *Caballero* court specified that in future cases, "the sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or

---

[7] *Miller* was filed on June 25, 2012; *Caballero* was filed on August 16, 2012.

24

her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board.  The Board of Parole Hearings will then determine whether the juvenile offender must be released from prison 'based on demonstrated maturity and rehabilitation.'  [Citation.]"  (*Id.* at pp. 268-269.)

The *Caballero* court also noted that its holding would apply to cases in which defendants were already sentenced to LWOP or "equivalent de facto sentences" for crimes they committed as juveniles.  (*Caballero, supra,* 55 Cal.4th at p. 269.)  In such cases, defendants "may file petitions for writs of habeas corpus in the trial court in order to allow the court to weigh the mitigating evidence in determining the extent of incarceration required before parole hearings."  (*Ibid.*)

The Attorney General asserts that under *Caballero,* defendant must bring his cruel and unusual punishment challenge in a petition for writ of habeas corpus, since defendant had already been sentenced to a de facto LWOP sentence at the time *Caballero* was filed. The Attorney General also cites to California Rules of Court, rule 8.385(c)(2), which provides:  "A Court of Appeal should deny without prejudice a petition for writ of habeas corpus that challenges the denial of parole or the petitioner's suitability for parole if the issue was not first adjudicated by the trial court that rendered the underlying judgment."

Defendant contends that his claim is properly brought in this direct appeal, because *Caballero*'s habeas discussion applies only to cases that were final at the time that decision was issued.

We agree with defendant that *Caballero* does not foreclose him from raising this issue in the present appeal.  Because defendant's case is still pending on direct appeal, the judgment is not yet final.  Further, rule 8.385(c)(2) is irrelevant, since defendant has not filed a petition for writ of habeas corpus on this issue in this court, nor has he challenged the denial of parole or his suitability for parole.  Thus, we will proceed to consider the merits of defendant's claim.

25

### 4. Applicable Law

In *Miller*, the United States Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " (*Miller, supra,* 567 U.S. ___ [132 S.Ct. at p. 2460].) The court explained that its prior cases "establish that children are constitutionally different from adults for purposes of sentencing." (*Id.* at p. __ [132 S.Ct. at p. 2464]; see *Roper v. Simmons* (2005) 543 U.S. 551 [invalidating death penalty for juvenile offenders] and *Graham v. Florida* (2010) 560 U.S. 48 [LWOP sentences for non-homicide juvenile offenders violate the Eighth Amendment].) Specifically, "juveniles have diminished culpability and greater prospects for reform," making them " 'less deserving of the most severe punishments.' " (*Ibid.*)

The *Miller* court summarized its holding as follows: "Mandatory life without parole for a juvenile precludes consideration of his [or her] chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him [or her]—and from which he [or she] cannot usually extricate himself [or herself]—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his [or her] participation in the conduct and the way familial and peer pressures may have affected him [or her]. Indeed, it ignores that he [or she] might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his [or her] inability to deal with police officers or prosecutors (including on a plea agreement) or his [or her] incapacity to assist his [or her] own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Miller, supra,* 567 U.S. ___ [132 S.Ct. at p. 2468].)

The *Miller* court declined to hold "that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger."

(*Miller, supra,* 567 U.S. ___ [132 S.Ct. at p. 2469].) However, the court specified it believed that LWOP sentences for juveniles would be "uncommon" and limited to " 'the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.]" (*Id.* at p. ___ [132 S.Ct. at p. 2469].) The court specified that before such a sentence is imposed on a juvenile in a homicide case, the sentencing court must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Id.* at p. ___ [132 S.Ct. at p. 2469].)

At least two recently published California appellate opinions have addressed the interplay of *Miller* and *Caballero*—that is, whether *Miller* applies when a juvenile has been sentenced to "a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy." (*Caballero, supra,* 55 Cal.4th at p. 268.)

In *People v. Argeta* (2012) 210 Cal.App.4th 1478, one of the defendants was a 15-year-old juvenile at the time he and an adult codefendant committed the crimes. (*Id.* at p. 1480.) The juvenile was convicted of murder and five counts of attempted murder, all as an aider and abettor. (*Ibid.*) He was sentenced to 100 years in prison, i.e., "the functional equivalent" of an LWOP sentence. (*Id.* at p. 1482.) Division Four of the Second District Court of Appeal concluded that the matter should be remanded for resentencing "[b]ased on these circumstances" and in light of *Miller* and *Caballero*. (*Ibid.*)

In *People v. Thomas* (2012) 211 Cal.App.4th 987, one of the defendants was a 15-year-old juvenile at the time of the offenses. (*Id.* at p. 1015.) The juvenile was convicted of two counts of murder, three counts of attempted premeditated and deliberate murder, and two counts of shooting at an occupied motor vehicle. (*Id.* at pp. 990-991.) The jury found true special circumstances, firearm use allegations, great bodily injury allegations, and gang enhancements. (*Ibid.*) The juvenile was sentenced to an aggregate prison term of 196 years to life. (*Id.* at p. 992.) At the sentencing hearing, which was held prior to the *Caballero* and *Miller* decisions, the trial court indicated its belief that it could not

27

impose an actual LWOP sentence " 'because of his age.' " (*Id.* at p. 1016.)  Division One

of the Fourth District remanded the matter for resentencing, noting that the juvenile's

sentence was the functional equivalent of an LWOP sentence and that under *Miller,* such

a sentence could in fact be imposed on " ' "the rare juvenile offender whose crime

reflects irreparable corruption." ' [Citation.]" (*Ibid.*)[8]

### 5.    Application to this Case

Here, defendant was sentenced to an indeterminate term of 85 years to life for an

offense he committed when he was 17 years old.  He earned 1050 days (nearly three

years) of presentence custody credit, but he is barred from accruing any conduct credits

while in prison.  (See §§ 190, subd. (d), 2933.2, subd. (a).)  Defendant was 20 years old at

the time of sentencing.  Since under current law he will not be eligible for parole until

more than 82 years from the date of sentencing—i.e., until he is over 102 years old,

beyond a normal life expectancy—his sentence was the equivalent of an LWOP sentence.

(See § 3046, subd. (b).)

At the sentencing hearing in this case, the trial court did not have the guidance of

the *Miller* or *Caballero* decisions.  In imposing sentence, the trial court did not consider

all of the factors listed in those cases, including defendant's "chronological age and its

hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks

and consequences," his "family and home environment," and "the way familial and peer

pressures may have affected him." (*Miller, supra,* 132 S.Ct. at p. 2468.)  Although the

trial court did consider the factors in aggravation and the factors in mitigation listed in

California Rules of Court, rules 4.421 and 4.423, nothing in the record indicates the trial

---

[8] Several other recently filed published opinions have also addressed the interplay
of *Miller* and *Caballero*, but those cases are not yet final.  (See *In re Alatriste* (2013)
220 Cal.App.4th 1232, petn. for review pending, petn. filed Dec. 3, 2013, S214652;
*People v. Martin* (2013) 222 Cal.App.4th 98; *People v. Lewis* (2013) 222 Cal.App.4th
108, petn. for review pending, petn. filed Jan. 22, 2014, S216019; *In re Heard* (Jan. 22,
2014, D063181) __ Cal.App.4th __ [2014 WL 231983].)

court took into account "how children are different" or that it considered whether defendant was " 'the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.]" (*Miller, supra,* 132 S.Ct. at p. 2469.)  Thus, we believe that remand for resentencing is required.[9]

### 6. Mootness

Recently, the Legislature enacted Senate Bill No. 260 (2013-2014 Reg. Sess.), which, inter alia, requires the Board of Parole Hearings to conduct youth offender parole hearings and makes youth offenders eligible for release on parole by at least the 25th year of incarceration.  (Sen. Bill No. 260 (2013-2014 Reg. Sess.) ch. 312, § 4.)  The Legislature specified that the purpose of the bill "is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with [*Caballero* and *Miller*]." (Sen. Bill No. 260 (2013-2014 Reg. Sess.) ch. 312, § 1.)  The bill was approved by the Governor on September 16, 2013 and filed with the Secretary of State that same day.  It became effective on January 1, 2014.

We asked the parties for supplemental briefing on the effect, if any, of Senate Bill No. 260 on defendant's claim that remand for resentencing is required here.

The Attorney General asserts that "[t]his bill, if enacted[,] would take care of all the problems cited by [defendant]" and that it renders moot defendant's cruel and unusual punishment claim.

---

[9] The California Supreme Court is currently considering issues related to juvenile LWOP sentences in *People v. Gutierrez* (2012) 209 Cal.App.4th 646, review granted Jan. 23, 2013, S206365 and *People v. Moffett* (2012) 209 Cal.App.4th 1465, review granted Jan. 18, 2013, S206771.  (See also *People v. Ramirez* (2013) 219 Cal.App.4th 655, review granted Dec. 18, 2013, S214133 [briefing deferred].)  In those cases, the LWOP sentences were imposed pursuant to section 190.5, subdivision (b).

29

Defendant contends that "[u]nless[] the present case is remanded, the trial court will not have the opportunity to develop the facts that will assist the parole board in determining when [defendant] should be released." He notes that the presentence report prepared in this case did not contain all of the information that must be considered under *Miller* and *Caballero*. He further notes that while Senate Bill No. 260 will provide defendant with a minimum eligible parole release date of 25 years (instead of the current 85 years), defendant will not meet with the Board of Parole Hearings until the sixth year before that release date—i.e., 19 years after sentencing. (See Sen. Bill No. 260 (2013-2014 Reg. Sess.) ch. 312, §§ 2, 4.)

We conclude that the enactment of Senate Bill No. 260 does not render defendant's claim moot. *Caballero* establishes that it is the trial court's role to consider "all mitigating circumstances attendant in the juvenile's crime and life," thus enabling the Board of Parole Hearings to later determine "whether the juvenile offender must be released from prison 'based on demonstrated maturity and rehabilitation.' [Citation.]" (*Caballero, supra,* 55 Cal.4th at pp. 268-269.) Likewise, *Miller* establishes that the sentencing court must consider particular factors prior to imposing sentence. (*Miller, supra,* 132 S.Ct. at p. 2468.) In defendant's case, remanding for resentencing in light of *Caballero* and *Miller* will allow the trial court to develop the pertinent facts, which will help it determine the appropriate sentence to impose now. The trial court may well determine, after considering the factors specified in the *Miller* or *Caballero* decisions, that defendant's sentence should be less than his current sentence of 85 years to life. Development of the pertinent facts now will also help the Board of Parole Hearings make the later determination of whether defendant has demonstrated sufficient maturity and rehabilitation to warrant release on parole.

## DISPOSITION

The judgment is reversed and the matter is remanded for resentencing in light of *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455] and *People v. Caballero* (2012) 55 Cal.4th 262.

_____

BAMATTRE-MANOUKIAN, ACTING P.J.

I CONCUR:

_____

MÁRQUEZ, J.

31

GROVER, J., Concurring and Dissenting

I join in the opinion of the court except as to the conclusion that the matter should be remanded for resentencing.

Although I agree that defendant's Eighth Amendment sentencing issue is not forfeited and is properly before the court, I believe the sentencing issue is mooted by the September 2013 enactment of Senate Bill No. 260 (SB 260), which amended Penal Code sections 3041, 3046, and 4801, and added Penal Code section 3051.  (S.B. No. 260 (2013–2014 Reg. Sess.) Stats. 2013, ch. 312.)

In *Graham v. Florida* (2010) 560 U.S. 48, 74 (*Graham*), the Supreme Court held that the Eighth Amendment prohibits imposition of a life without the possibility of parole sentence for juvenile nonhomicide offenders.  *Graham* recognized that such a sentence is especially harsh for a juvenile offender who will spend more years and a greater percentage of his or her life in prison than a similarly sentenced adult.  (*Id*. at p. 70.) *Graham* concluded that a nonhomicide juvenile offender is entitled to a sentence that provides "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."  (*Id*. at p. 75.)

Two years later, in *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455, 2460] (*Miller*), the Supreme Court extended *Graham's* reasoning to mandatory life without the possibility of parole sentences for juvenile offenders.  Even when mandated by statute, before imposing a life without the possibility of parole sentence—the harshest possible penalty for a juvenile—a judge or jury "must have the opportunity to consider mitigating circumstances," particularly the offender's "youth and attendant characteristics."  (*Id*. at pp. ___, ___ [132 S.Ct. at pp. 2471, 2475].)

Responding to *Graham* and *Miller*, in *People v. Caballero* (2012) 55 Cal.4th 262, 268 (*Caballero*) our Supreme Court found a juvenile sentence that was functionally equivalent to life without the possibility of parole to be cruel and unusual punishment under *Graham*.  The defendant in *Caballero* received a 110-year-to-life term for three

1

counts of premeditated attempted murder with gang, firearm, and great bodily injury enhancements. (*Id*. at p. 265.) The sentence was unconstitutional because his parole eligibility date would be beyond his natural life expectancy, leaving him no opportunity to " 'demonstrate growth and maturity' to try to secure his release, in contravention of *Graham*'s dictate." (*Id.* at p. 268.) *Caballero* directed "[d]efendants who were sentenced for crimes they committed as juveniles who seek to modify life without parole or equivalent de facto sentences already imposed [to] file petitions for a writ of habeas corpus . . . to allow the [trial] court to weigh the mitigating evidence in determining the extent of incarceration required before parole hearings." (*Id.* at p. 269.) *Caballero* also urged the Legislature to establish a parole eligibility mechanism to allow juvenile offenders "the opportunity to obtain release on a showing of rehabilitation and maturity." (*Id*. at p. 269, fn. 5.)

The Legislature responded to *Caballero* by providing a parole eligibility mechanism not only for nonhomicide juvenile offenders, but for all juvenile offenders. SB 260 applies to "any inmate sentenced pursuant to any law . . . ." (Pen. Code, § 3041, subd. (a), as amended by SB 260 (2103–2014 Reg. Sess.) § 2.) Section 1 of SB 260 refers to *Graham*, *Miller*, and *Caballero* and declares: "The purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity . . . . It is the intent of the Legislature to create a process by which growth and maturity of youthful offenders can be assessed and a meaningful opportunity for release established." New Penal Code section 3051 requires the Board of Parole Hearings to "conduct a youth offender parole hearing to consider release" during a juvenile offender's 15th, 20th, or 25th year of incarceration depending on the length of the offender's sentence. The law went into effect on January 1, 2014 and by its terms it applies to defendant. (Pen. Code, § 3041, subd. (a).) Because defendant was sentenced 25 years to life for his controlling

2

offense, his parole hearing will be held during the 25th year of his incarceration. (Pen. Code, § 3051, subd. (b).)

No one disputes that defendant's 85-years-to-life term is functionally equivalent to life without the possibility of parole. Thus, if not for SB 260 defendant would be entitled to a remand for the trial court to assess whether his offenses reflect "irreparable corruption" within the meaning of *Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2469], to warrant a de facto life without the possibility of parole sentence. That was the action taken by the court in *People v. Lewis* (2013) 222 Cal.App.4th 108, petn. for review pending, petn. filed Jan. 22, 2014 (*Lewis*), which remanded a juvenile offender's 115-years-to-life homicide sentence so that the sentencing court could either make an irreparable corruption finding under *Miller* or "determine a parole eligibility date within Lewis' expected lifetime." (*Id*. at p. 110.) Notable for its absence in the December 2013 *Lewis* opinion, however, is any mention of even the existence of SB 260.

It is my view that by providing defendant with a parole eligibility date, the new law removes this case from the purview of *Miller*. The sentencing procedure announced in *Miller* applies when the juvenile is facing life without the possibility of parole. (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2475] [requiring sentencing court "to consider mitigating circumstances before imposing the harshest possible penalty for juveniles."].) Because defendant is no longer lacking a parole opportunity within his expected lifetime, he is not entitled to a mitigation hearing under *Miller*. (*In re Alatriste* (2013) 220 Cal.App.4th 1232, 1236, petn. for review pending, petn. filed Dec. 3, 2013 [denying request for *Miller* resentencing as moot in light of SB 260]; *People v. Martin* (2013) 222 Cal.App.4th 98, 105 (*Martin*) [juvenile's 45-year-to-life sentence constitutional in light of new Penal Code section 3051].)

By design, Penal Code section 3051 now affords defendant " 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " (*Martin*, *supra*, 222 Cal.App.4th at p. 105, quoting *Graham*, *supra*, 560 U.S. at p. 75.) A

3

parole eligibility date need not be determined by the sentencing court. (*Alatriste*, *supra*, 220 Cal.App.4th at p. 1240.) With a parole eligibility date now provided by operation of law, defendant's sentence is no longer " 'the functional equivalent of a life without parole sentence' " as described in *Caballero*. (*Martin*, *supra*, at p. 105, quoting *Caballero*, *supra*, 55 Cal.4th at p. 268.)

The majority views *Caballero* as requiring the trial court to "consider 'all mitigating circumstances attendant in the juvenile's crime and life,' " thus enabling the Board of Parole Hearings to later determine "whether the juvenile offender must be released from prison 'based on demonstrated maturity and rehabilitation.' " (Maj. Op. at p. 30, citing *Caballero*, *supra*, 55 Cal.4th at pp. 268–269.) But *Caballero*'s mandate is not so broad. *Caballero* directed sentencing courts to consider mitigating circumstances for the purpose of setting parole eligibility dates. (*Martin*, *supra*, 222 Cal.App.4th at p. 105.) *Caballero* does not require the sentencing court to compile information for later use by the Board of Parole Hearings in assessing an offender's maturity and rehabilitation. (*Caballero*, *supra*, at p. 269.)

With the addition of section 3051 to the Penal Code, defendant no longer faces the functional equivalent of life without the possibility of parole for crimes he committed as a juvenile. He is therefore not entitled to a new sentencing hearing under *Miller* or to a remand under *Caballero* to determine the time for parole eligibility. I would affirm the judgment.

_____
Grover, J.

4